121 P.3d 1166 (2005)
In the Matter of the Petition of the Seattle Popular Monorail Authority, a City Transportation Authority, to Acquire by Condemnation Certain Real Property for Public use as Authorized by Resolution No. 04-16.
HTK MANAGEMENT, L.L.C., Appellant,
v.
SEATTLE POPULAR MONORAIL AUTHORITY, a/k/a Seattle Monorail Project, Respondent.
No. 76462-0.
Supreme Court of Washington, En Banc.
Argued March 17, 2005.
Decided October 20, 2005.
*1168 George Kresovich, Timothy D. Benedict, Hillis Clark Martin & Peterson, Seattle, for Appellant.
P. Stephen DiJulio, Roger Duane Mellem, Foster Pepper & Shefelman PLLC, Seattle, for Respondent.
William R. Maurer, Charity Osborn, Institute for Justice/WA State Chapter, Seattle, Jeanette Motee Petersen, Bellevue, for Amicus Curiae (Institute for Justice Washington Chapter).
Daryl A. Deutsch, Bellevue, for Amicus Curiae (Paul D. and Josephine M. Fiorito).
Paul Arley Harrel, Alan Lea Wallace, Williams Kastner & Gibbs PLLC, Seattle, for Other Party (Ampco System Parking).
John Robert Zeldenrust, King County Prosecutor's Office/Appellate Unit, Seattle, for Other Party (King County of Finance).
Larry John Smith, Graham & Dunn PC, Seattle, for Other Party (Rokan Partners).
MADSEN, J.
¶ 1 HTK Management, L.L.C. (HTK), a property owner in downtown Seattle, challenges a trial court order adjudicating public use and necessity that authorizes Seattle Popular Monorail Authority, a/k/a Seattle Monorail Project (SMP), a city transportation authority, to condemn its property to build a monorail station. In this case, both parties agree that the use of the property here for construction of public transportation is a fundamental "public use."[1] However, HTK alleges that SMP lacks statutory authority to condemn property in the first place and, alternatively, that the adjudication of public use and necessity was improper because, HTK contends, while SMP permissibly condemned a fee interest in the property comprising the monorail footprint, it should have been limited to a multiyear lease on the remainder.
¶ 2 We hold that SMP has statutory authority to condemn property and affirm the trial court's order adjudicating public use and necessity.

FACTS
¶ 3 Traffic is a significant problem in the state of Washington. In 2002, the Washington Alliance for a Competitive Economy reported that "[t]ransportation remains the dominant infrastructure concern in the state, particularly in the Central Puget Sound region" and provided the following data: (1) congestion in the Seattle-Everett Corridor ranks second only to Los Angeles, (2) Washington ranks 32nd on per capita state disbursements for highways and local roads, (3) Washington's 23-cent gas tax, unchanged since 1991, ranks 14th in the nation, and (4) Seattle ranked just 64th on Expansion Management magazine's September 2001 evaluation of the "100 Most Logistics Friendly Cities."[2]
¶ 4 The 2002 report concludes that "[w]ith most business in Washington eventually involving the movement of goods and people through the congested metropolitan Puget Sound corridor, gridlock puts the economic competitiveness of all communities at risk."[3]
¶ 5 Since 1997, Seattle residents have voted four times in favor of building an expanded monorail public transportation system within the city of Seattle.[4] In November 1997, voters in the city of Seattle passed Initiative 41, creating a public development *1169 authority, the Elevated Transportation Company, to build, maintain, and operate an elevated, electrically powered mass transit system consisting of specified stations and terminals serving the four quadrants of Seattle and running through downtown. The system would be generally "X" shaped and would lie entirely within Seattle.[5]
¶ 6 In July 2000, the Seattle City Council passed Ordinance 120049, amending Initiative 41. Among other things, the ordinance dissolved the Elevated Transportation Company and deleted the requirement that the city council make funds available for the system if necessary by either issuing bonds or raising the city's business and occupation tax.[6]
¶ 7 In November 2000, voters in Seattle voted the second time for the monorail, passing Seattle Proposition No. 2 (Initiative 53), which reestablished the Elevated Transportation Company. The Elevated Transportation Company would have up to two years to complete a plan for a monorail system in Seattle. Once the monorail plan was completed, Initiative 53 provided that the Seattle City Council would be required to place the monorail plan before Seattle voters at the next election. Initiative 53 also provided for the repeal of any ordinance that had repealed or amended prior Initiative 41 and that was inconsistent with Initiative 53, and for reinstatement of that part of Initiative 41 that had been repealed or amended.[7]
¶ 8 In 2002, the Washington State Legislature enacted an enabling statute which authorized voters from cities with a population over 300,000 to create a "city transportation authority" to build a public monorail within that city. Ch. 35.95A RCW. RCW 35.95A.050 provides that a city transportation authority will have a number of powers including the power to "acquire by purchase, condemnation, gift, or grant and to lease, construct, add to, improve, replace, repair, maintain, operate, and regulate the use of public monorail transportation facilities." RCW 35.95A.050(1).
¶ 9 A city transportation authority may fix rates, tolls, fares, and charges for use of facilities and may establish various routes and classes of service. RCW 35.95A.050(2). Additionally, a city transportation authority may "[n]otwithstanding the provision of any law to the contrary, and in addition to any other authority provided by law," contract with one or more vendors for the design, construction, operation, or maintenance or other service related to the development of a monorail public transportation system. RCW 35.95A.050(3)(a).
¶ 10 Finally, among other powers, a city transportation authority will have "all other powers necessary and appropriate to carry out its responsibilities, including without limitation the power to sue and be sued, to own, construct, purchase, lease, add to, and maintain any real and personal property or property rights necessary for the conduct of the affairs of the authority, to enter into contracts, and to employ the persons as the authority deems appropriate. An authority may also sell, lease, convey, or otherwise dispose of any real or personal property no longer necessary for the conduct of the affairs of the authority." RCW 35.95A.050(8).
¶ 11 Seattle residents voted for the third time in favor of the monorail in November 2002, passing Citizen Petition No. 1: Proposed Seattle Monorail Authority. Citizen Petition No. 1 created a Seattle city transportation authority, now named Seattle Popular Monorail Authority, a/k/a Seattle Monorail Project, (SMP), respondent in this case. Citizen Petition No. 1 implemented the initial phase of a five-line city monorail system by authorizing the construction and operation of a 14-mile monorail line, the "Green Line." The Green Line will connect Ballard, Key Arena, Seattle Center, Belltown, *1170 downtown Seattle, Pike Place Market, Benaroya Hall, the ferry terminal, Pioneer Square, the Chinatown-International District, the King Street train station, Safeco Field, the Qwest Field, and West Seattle. The Green Line will have 19 monorail stations and is intended to connect with buses, ferries, light rail, and trains. Construction is scheduled to begin in 2005.
¶ 12 In November 2004, Seattle residents voted again, for the fourth time, for the monorail, defeating Initiative 83. Initiative 83, if enacted into law, would have forbidden the city of Seattle from allowing the use of its city rights-of-way for any new monorail transit facilities, such as the Green Line.[8]
¶ 13 Seattle residents voted overwhelmingly in favor of the monorail  63.52 percent voted "no" for Initiative 83.[9]
¶ 14 On April 7, 2004, SMP passed Resolution No. 04-16 to acquire by condemnation certain property for the Second and Yesler station, the Pioneer Square station, in downtown Seattle. The property is currently a parking garage, commonly referred to as "the sinking ship garage" (the property). The property is owned in fee by the appellant, HTK. The property is also subject to a long-term ground lease. The tenant's ground lease ends in 2010, with the tenant possessing a 10-year option to extend the lease through 2020. The Second and Yesler station will be constructed on a triangle of property bounded by Second Avenue, Yesler Way, and James Street in downtown Seattle. The Second and Yesler station will provide an intermodal transportation function with connections to the ferry system, the waterfront street car, buses, and light rail.
¶ 15 SMP has not yet approved a final design for the Second and Yesler station. Some preliminary designs show the station footprint covering the entire property, other more recent designs show a smaller footprint. The final design will be determined by the "Design, Build, Operate, and Maintain" contractor, with the approval of SMP's board and the city of Seattle. The parties agree that regardless of the ultimate size of the Second and Yesler station, SMP needs the entire property for construction of the staging and development of the Green Line alignment in the vicinity of the Second and Yesler station. After construction of the station, SMP currently has no planned use for any portion of the property that may remain uncovered by the final station design. SMP states that it would be premature to make definitive plans for the property that may possibly fall outside of the footprint. For example, a portion of the property may be used for loading and unloading passengers from para-transit vehicles, taxis, and tour buses. After the monorail is completed, SMP may lease or sell the unused portions of the property, if any.
¶ 16 On April 28, 2004, SMP filed a petition for condemnation in King County Superior Court and gave notice to HTK. On July 19, 2004, HTK entered into a stipulated order with SMP regarding the public use and necessity and preliminary possession of the subject property. HTK and SMP stipulated that the proposed use for the property is a public use, that the portion of the property covered by the station footprint is necessary for that use, and that the portion of the property not covered by the station footprint is necessary for that use until construction of the Green Line is complete.
¶ 17 On August 13, 2004, HTK filed a motion to dismiss the case for lack of subject matter jurisdiction. The trial court denied that motion, ruling that because the eminent domain procedures set forth in chapter 8.12 RCW govern condemnation actions brought by SMP, SMP has statutory authority to condemn property, and therefore the trial court had subject matter jurisdiction over the condemnation action.
*1171 ¶ 18 On September 13, 2004, the hearing on public use and necessity was held. The trial court denied HTK's motion for reconsideration of the order denying the motion to dismiss and entered an order adjudicating public use and necessity. HTK filed a notice of appeal and a motion for accelerated review. On October 1, 2004, the Court of Appeals granted HTK's motion for accelerated review.
¶ 19 This court accepted certification from the Court of Appeals.[10]

ANALYSIS

1. Statutory Authority for SMP to Condemn
¶ 20 HTK first contends that chapter 35.95A RCW, the statute authorizing creation of SMP, does not specify the procedure for SMP to exercise its condemnation power. Accordingly, HTK argues that SMP is precluded from exercising that power.
¶ 21 RCW 35.95A.020(1) authorizes every city with a population greater than 300,000 to create a city transportation authority "to perform a public monorail transportation function." A city transportation authority created under the statute "is a municipal corporation, an independent taxing `authority' within the meaning of Article 7, section 1 of the state Constitution, and a `taxing district' within the meaning of Article 7, section 2 of the state Constitution." RCW 35.95A.020(1).
¶ 22 A municipal corporation does not have inherent power of eminent domain and may exercise such power only as is expressly authorized by the legislature. In re Pet. of Seattle, 96 Wash.2d 616, 638 P.2d 549 (1981) (Westlake); City of Des Moines v. Hemenway, 73 Wash.2d 130, 437 P.2d 171 (1968); City of Tacoma v. Welcker, 65 Wash.2d 677, 399 P.2d 330 (1965). Statutes granting the power of eminent domain are to be strictly construed. City of Seattle v. State, 54 Wash.2d 139, 338 P.2d 126 (1959). However, while the legislature's grant of the eminent domain power to a municipality is to be construed strictly, it is not to be construed so strictly as to defeat the purpose of the legislative grant. Welcker, 65 Wash.2d at 683, 399 P.2d 330. "[I]t is not necessary that [eminent domain statutes] cover in minute detail everything which may be done to carry out their purpose. Even though a power is not given in specific words, it may be implied if its existence is reasonably necessary to effect the purpose of the condemning authority." In re Pet. of Port of Grays Harbor, 30 Wash.App. 855, 862, 638 P.2d 633 (1982) (citing State ex rel. Hunter v. Superior Court, 34 Wash.2d 214, 217, 208 P.2d 866 (1949)); see also Chem. Bank v. Wash. Pub. Power Supply Sys., 99 Wash.2d 772, 792, 666 P.2d 329 (1983) ("a municipal corporation's powers are limited to those conferred in express terms or those necessarily implied").
¶ 23 The legislature must confer not only the power to condemn but must "prescribe the method by which it is to be done." City of Tacoma v. State, 4 Wash. 64, 66, 29 P. 847 (1892). Where the legislature has failed to provide a procedure, "either directly or by implication or by reference to other acts having a similar purpose," the condemning entity has no authority to condemn. State ex rel. Mower v. Superior Court, 43 Wash.2d 123, 131, 260 P.2d 355 (1953). As a general rule,
[w]hen a state delegates to a municipality the right to condemn private property for a public use but the statute delegating that authority does not provide a method for its exercise, the general law of the state prescribing the procedure, and the method of ascertaining the damages is, by implication, a part of the law delegating the power.
11A EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 32.117, at 207-08 (3d ed.2000).
¶ 24 SMP's condemnation powers are set forth in RCW 35.95A.050(1). As HTK correctly states, RCW 35.95A.050(1) does not specify the procedure that SMP must use when exercising its condemnation power. *1172 The question then is whether a method or procedure can be inferred from the statute.
¶ 25 Relying primarily on one case, Mower, HTK claims that condemnation procedures cannot be inferred and that the legislature must incorporate a particular Title 8 RCW procedure by reference or prescribe an alternative procedure to be used by the condemning entity in the authorizing statute. In Mower, a metropolitan park district brought a condemnation action pursuant to RCW 35.61.130, which granted the district that authority. The property owners resisted the condemnation, claiming that the statute failed to prescribe a condemnation procedure and, therefore, the district lacked authority to condemn. Mower, 43 Wash.2d at 127, 260 P.2d 355. On appeal, this court reiterated the constitutional requirement that before private property may be taken or damaged for a public or private use, just compensation must be made or be ascertained "in the manner prescribed by law." CONST. art. I, § 16. The court noted that although a number of statutes set forth condemnation procedures for particular entities, none provided procedures for park districts. The court then observed that the general procedural statute upon which the park district relied had been repealed and opined that the legislature had intended to provide specific statutory procedures for specific condemning entities. Turning to RCW 35.61.130, the court found nothing in the district's authorizing statute "either directly or by implication or by reference to other acts having a similar purpose" setting forth the procedure for condemnation by a metropolitan park district. Mower, 43 Wash.2d at 131, 260 P.2d 355. Accordingly, the court held that the district had no authority to condemn the property at issue. Id. HTK claims that, as with the park district in Mower, SMP has no authority to condemn because the legislature did not provide a method for the exercise of its eminent domain power as required by article I, section 16 of the Washington Constitution.
¶ 26 SMP contends that HTK's reading of Mower is too broad, pointing to the language quoted above to the effect that a condemnation procedure may be implied. Further, SMP points to a distinction between RCW 35.95A.050(1) and the statute at issue in Mower. The park district statute in that case authorized a metropolitan park district to condemn territory outside the territorial limits of the proposing city, including areas of the unincorporated county.[11] Since condemnation procedures for both cities and counties might be implicated and because the court in Mower could not reasonably infer the procedure to be used by a park district from the authorizing statute or from other statutes relating to condemnation, the court declined to "make up such procedures out of whole cloth." Mower, 43 Wash.2d at 130, 260 P.2d 355.
¶ 27 In contrast, SMP points out that RCW 35.95A.050(1) authorizes SMP to condemn property only within the physical confines of the proposing city. Thus, unlike the authorizing statute in Mower, SMP argues that it can reasonably be inferred from RCW 35.95A.050 that the legislature intended SMP to use the general condemnation procedures prescribed for cities in chapter 8.12 RCW. SMP reasons that RCW 35.95A.050 authorizes the city to establish a "city transportation authority" that will operate within the boundaries of the city and provides that the transportation authority is to be created by city ordinance or by petition of the city's residents. RCW 35.95A.030(1), (2).[12] As such, SMP is a creature of the city. Accordingly, SMP contends, by necessary implication, the condemnation procedure for cities, chapter 8.12 RCW, is applicable to SMP.
¶ 28 HTK claims that Mower requires that a method or procedure for condemnation must be express. First, HTK argues that there is little difference between the park district in Mower and SMP because, as with a transportation authority under chapter *1173 35.95A RCW, a park district is a municipal corporation that can be formed by only a first class city. Further, HTK contends both the park district statute and SMP's authorizing statute authorize condemnation outside their respective territorial limits. Finally, HTK argues that even if there is a distinction to be made on the scope of the condemnation power, territorial boundaries were not even mentioned by the Mower court.
¶ 29 We agree with SMP that HTK is reading Mower too broadly. In Mower, the court distinguished an earlier decision, Town of Redmond v. Perrigo, 84 Wash. 407, 146 P. 838 (1915). In Perrigo the property owner argued that the city of Redmond was without power to condemn because no procedure had been provided in the act authorizing condemnation. Perrigo was proceeding under the authority of the public utilities act, authorizing cities to condemn property for the purposes of supplying water. However, that statute did not include a method of condemnation. Perrigo, 84 Wash. at 409, 146 P. 838. The court rejected the challenge to the town's condemnation authority, stating that "[w]here the power is given, a method will be accorded." Id. at 409, 146 P. 838. The court then turned to the general condemnation statute and held that the statute provided the proper method for the town to follow. Id. Mower noted that the general condemnation statute referenced in Perrigo had been repealed and, therefore, the park district could not rely on that general authority. Mower, 43 Wash.2d at 130-31, 260 P.2d 355. Perrigo, like Mower, indicates that a procedure need not be expressly referenced in the authorizing statute and that general procedural statutes may impliedly provide the method for exercising the condemnation power.
¶ 30 Recent cases also suggest that procedures need not be expressly referenced in condemnation statutes. In Port of Edmonds v. Northwest Fur Breeders Cooperative, Inc., 63 Wash.App. 159, 816 P.2d 1268 (1991), the property owners appealed an order of public use and necessity contending that the Port of Edmonds had failed to give proper statutory notice of the condemnation, which was authorized at a port hearing. The port argued that RCW 53.08.010, which authorizes ports to exercise the eminent domain power, requires the port to follow the procedure applicable to first-class cities and references chapter 8.12 RCW. The port contended that since it followed the procedures of chapter 8.12 RCW, it had satisfied statutory requirements. The Court of Appeals disagreed. It reasoned that because the condemnation was established by ordinance, the port was also required to comply with RCW 35.22.288, governing the adoption of ordinances by first-class cities. Although the port's authorizing statute, RCW 53.08.010, did not reference RCW 35.22.288, the Court of Appeals nevertheless concluded that compliance with RCW 35.22.288 was required.
¶ 31 Similarly, Silver Firs Town Homes, Inc. v. Silver Lake Water District, 103 Wash. App. 411, 12 P.3d 1022 (2000), lends weight to SMP's argument. There the property owner claimed that the water district was required to give public notice of proposed rate changes, pursuant to RCW 35.22.288, which apply to first-class cities. The owner reasoned that because the district's authorizing statute, RCW 57.08.010, requires water districts to follow eminent domain procedures for cities, it should be required to follow the notice requirements for cities when engaging in rate setting. The court declined to imply a requirement that the district comply with the notice requirements of RCW 35.22.288 because water districts are not first-class cities. The court did, however, imply a requirement that the district follow the notice requirements under the Open Public Meetings Act of 1971 (OPMA), chapter 42.30 RCW, even though the water district statute, RCW 57.08.010, did not mention the OPMA.[13]
¶ 32 Considering case law both before and since Mower, we hold that powers reasonably necessary to carry out a grant of the eminent domain power may be inferred from the authorizing statute or from other statutes.
¶ 33 The next step is to determine whether chapter 35.95A RCW implies *1174 such procedures. The meaning of a statute is inherently a question of law and our review is de novo. King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wash.2d 543, 555, 14 P.3d 133 (2000); Dioxin/Organochlorine Ctr. v. Pollution Control Hr'gs Bd., 131 Wash.2d 345, 352, 932 P.2d 158 (1997). The primary goal of statutory interpretation is to ascertain and give effect to the legislature's intent and purpose. Am. Cont'l Ins. Co. v. Steen, 151 Wash.2d 512, 518, 91 P.3d 864 (2004); Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 9, 43 P.3d 4 (2002). This is done by considering the statute as a whole, giving effect to all that the legislature has said, and by using related statutes to help identify the legislative intent embodied in the provision in question. Campbell & Gwinn, 146 Wash.2d at 11, 43 P.3d 4. If, after this inquiry, the statute can reasonably be interpreted in more than one way, then it is ambiguous and resort to principles of statutory construction to assist in interpreting it is appropriate. State ex rel. Citizens Against Tolls (CAT) v. Murphy, 151 Wash.2d 226, 242-43, 88 P.3d 375 (2004); Campbell & Gwinn, 146 Wash.2d at 12, 43 P.3d 4.
¶ 34 Looking first to the language of the statute, a transportation authority can be created under RCW 35.95A.030 through a legislative act only by a city. RCW 35.95A.020 provides that a transportation authority created under the statute is a municipal corporation. A municipal corporation is defined as "a body politic established by law as an agency of the state  partly to assist in the civil government of the country, but chiefly to regulate and administer the local and internal affairs of the incorporated city, town, or district." Lauterbach v. City of Centralia, 49 Wash.2d 550, 554, 304 P.2d 656 (1956). Further, RCW 35.95A.040 provides that the transportation authority is "subject to all standard requirements of a governmental entity pursuant to RCW 35.21.759," which imposes on public corporations the general laws regulating the local government that created the entity. Taking these provisions into account and considering the fact that the legislature intended to grant condemnation powers to an entity created pursuant to chapter 35.95A RCW, we hold that, by implication, chapter 8.12 RCW, the procedure to be followed by a city, applies to SMP.
¶ 35 Next, HTK argues that merely because a transportation authority can be created only by a city does not mean that chapter 8.12 RCW is the obvious statute to be applied to SMP. HTK cites Fur Breeders for the proposition that condemnation procedures for cities are not limited to chapter 8.12 RCW. However, Fur Breeders suggests that chapter 8.12 RCW, in addition to other notice statutes specifically applying to cities, provides the requirements for the exercise of the eminent domain power. SMP does not contend that it is subject only to the requirements of chapter 8.12 RCW.
¶ 36 Finally, SMP argues that the procedures provided for an exercise of eminent domain are necessary to satisfy due process and that due process does not require the legislature to expressly designate the procedure to be followed when there is a statutory procedure available and is implied. SMP is correct. Due process concerns are at the core of article I, section 16's requirement that a method for condemnation be provided by law. HTK does not complain that its due process rights have been violated, and it has cited no case holding that due process requires the method of condemnation to be cross-referenced in legislation authorizing condemnation. Accordingly, we hold that SMP properly followed the condemnation method prescribed for cities in chapter 8.12 RCW.

2. Public Use and Necessity Determination
¶ 37 Washington's constitution provides that "[n]o private property shall be taken or damaged for public or private use without just compensation having first been made." CONST. art. I, § 16. Under long standing Washington jurisprudence, this court has developed a three-part test to evaluate eminent domain cases. State ex rel. Wash. State Convention & Trade Ctr. v. Evans, 136 Wash.2d 811, 817, 966 P.2d 1252 (1998) (Convention Center). For a proposed condemnation to be lawful, the condemning authority must prove that (1) the use is really *1175 public, (2) the public interest requires it, and (3) the property appropriated is necessary for that purpose. Convention Ctr., 136 Wash.2d at 817, 966 P.2d 1252 (citing Westlake, 96 Wash.2d at 625, 638 P.2d 549; King County v. Theilman, 59 Wash.2d 586, 593, 369 P.2d 503 (1962)).
¶ 38 A determination that an acquisition is for a "public use" is not precisely the same thing as determining it is a "public necessity," even though the two terms do overlap to some extent. Hemenway, 73 Wash.2d at 138, 437 P.2d 171. The "question [as to] whether the contemplated use be really public shall be a judicial question." CONST. art. I, § 16; Dickgieser v. State, 153 Wash.2d 530, 535, ¶ 10, 105 P.3d 26 (2005). Although the legislature may declare that a particular use of property is a "public use," that determination is not dispositive. Dickgieser, 153 Wash.2d at 535-36, ¶ 10, 105 P.3d 26. However, a legislative declaration is entitled to great weight. Westlake, 96 Wash.2d at 624-25, 638 P.2d 549 (citing Hemenway, 73 Wash.2d 130, 437 P.2d 171).
¶ 39 In contrast, the question of necessity, and thus the standard of judicial review of a declaration of public necessity, differs from that applied to a declaration of public use. Convention Ctr., 136 Wash.2d at 823, 966 P.2d 1252. A declaration of necessity by a proper municipal authority is conclusive in the absence of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud. Hemenway, 73 Wash.2d at 139, 437 P.2d 171 (citing Welcker, 65 Wash.2d 677, 399 P.2d 330; State ex rel. Church v. Superior Court, 40 Wash.2d 90, 91, 240 P.2d 1208 (1952)).[14]

a. Public use of property to build a public monorail
¶ 40 Unlike in Kelo v. City of New London, ___ U.S. ___, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), in this case it is undisputed that the use to which the property is to be put  public transportation  is a clear public use. Clerk's Papers (CP) at 15 (stipulation by the parties). Indeed, public transportation has been determined to be public use for nearly 100 years in Washington. City of Seattle v. Byers, 54 Wash. 518, 103 P. 791 (1909); State ex rel. Thomas v. Superior Court, 42 Wash. 521, 85 P. 256 (1906).[15]

b. Whether the determination of the property to be condemned is a judicial or legislative question
¶ 41 HTK claims that SMP's decision to condemn a fee interest in the entire property should be analyzed under the first prong of the test for "public use," rather than under the third prong of the test for "necessity." HTK asserts that SMP should have decided to condemn a fee interest in only the portion of the property that was likely to contain the monorail station and to condemn an easement interest in the remainder of the property that is to be used for construction staging and development of the Green Line alignment.
¶ 42 SMP correctly states that determinations by the condemning authority as to the type and extent of property interest necessary to carry out the public purpose have historically been considered legislative questions and are thus analyzed under the third prong of the test. In City of Tacoma v. Humble Oil & Refining Co., 57 Wash.2d 257, 356 P.2d 586 (1960), property owners appealed an order of public use and necessity. In that case, the city sought to condemn a fee simple interest in the land, which would include the mineral rights. This court noted that the property owners recognized the rule that "`the action of a public agency or a municipal corporation having the right of eminent domain in selecting land for a public use will not be controlled by the courts'" and is thus a legislative question. Id. at 258, 356 P.2d 586 (quoting State ex rel. Tacoma Sch. Dist. No. 10 v. Stojack, 53 Wash.2d 55, 64, 330 P.2d 567 (1958)). See also Port of Grays Harbor, 30 Wash.App. 855, 638 P.2d 633 (the court finding that it was a legislative question as to whether a fee *1176 or easement property interest should be condemned). These cases providing deference to legislative questions are rooted in long standing Washington law. Since the turn of the century, Washington courts have provided significant deference to legislative determinations of necessity in the context of eminent domain proceedings. See, e.g., State ex rel. Thomas v. Superior Court, 42 Wash. 521, 524-525, 85 P. 256 (1906).
¶ 43 Other states agree that a condemning authority's decision as to the type and extent of property interest is a legislative question. See, e.g., Westrick v. Approval of Bond of Peoples Natural Gas Co., 103 Pa. Comwlth. 578, 581, 520 A.2d 963 (1987) ("administrative decisions of a condemnor concerning the amount, location, or type of estate condemned are not subject to judicial review unless such decisions are in bad faith, arbitrary, capricious, or an abuse of power"; it is the condemnee's burden to prove an administrative abuse, and this burden is a heavy one to meet); City of New Ulm v. Schultz, 356 N.W.2d 846, 849 (1984) (finding that acquiring a fee interest in property was reasonably necessary; city need only show that acquiring a fee interest rather than an easement was a reasonable means of acquiring airport protection privileges); Concept Capital Corp. v. Dekalb County, 255 Ga. 452, 453, 339 S.E.2d 583 (1986) (court following the rule that, "`[i]n the absence of bad faith, the exercise rights of the right of eminent domain rests largely in the discretion of the authority exercising such right, as to the necessity and what and how much land shall be taken'") (quoting City of Atlanta v. Heirs of Champion, 244 Ga. 620, 621, 261 S.E.2d 343 (1979)); St. Andrew's Episcopal Day Sch. v. Miss. Transp. Comm'n, 806 So.2d 1105, 1111 (2002) (selection of the particular land to condemn as well as the amount of land necessary are legislative questions to be determined by the condemning authority). City of Phoenix v. McCullough, 24 Ariz.App. 109, 114, 536 P.2d 230 (1975) ("we believe the rule to be that a condemnor's determination of necessity should not be disturbed on judicial review in the absence of fraud or arbitrary and capricious conduct"); Regents of Univ. of Minn. v. Chi. & NW Transp. Co., 552 N.W.2d 578 (Minn.Ct.App.1996) (analyzing whether university demonstrated that proposed taking is "necessary," reviewed under the legislative standard of review).[16]
¶ 44 HTK claims, though, that Convention Center changes the standard of review for this case and that SMP's decision to condemn a fee interest is thus a judicial question. In Convention Center, this court addressed a proposed expansion of the Washington State Trade and Convention Center. The legislature appropriated $111.7 million for the expansion but, as a condition, required the convention center to contribute $15 million. The convention center developed a plan that involved condemning property across the street from the existing convention center. The proposed expansion would sit four stories above street level. The three floors below were to be sold to a private developer at the same time as the condemnation. The private developer would contribute $15 million and would build the outer shell of the convention center. In return, the private developer would take a fee simple title to the remaining three floors for construction of retail and parking. The court determined that the condemnation was a "public use," within the meaning of the Washington Constitution, and that the private development was "merely incidental." Convention Ctr., 136 Wash.2d at 822-23, 966 P.2d 1252.
¶ 45 HTK claims that because the court in Convention Center held that a private use was merely incidental when it was within the "footprint" of the convention center, this court is required to undertake a "public use" examination because, in this case, property may be sold to a private party that is outside the "footprint" of the proposed monorail station.
¶ 46 HTK's reliance on Convention Center is misplaced and does not alter the rule, as *1177 stated in Humble Oil and in Port of Grays Harbor, that decisions as to the amount of property to be condemned are legislative questions, reviewed under the legislative standard for necessity. Moreover, in Convention Center, the court was faced with a very different situation  condemnation of property on which a significant part was never going to be put to a public use. As SMP points out here, in contrast, the entire property will be put to a public use. As discussed above, public transportation has been determined to be a public use for nearly 100 years in Washington. City of Seattle v. Byers, 54 Wash. 518, 103 P. 791 (1909); State ex rel. Thomas v. Superior Court, 42 Wash. 521, 85 P. 256 (1906). Although the monorail station is not likely to take up the entire footprint of the property, the record indicates that the remaining portion of the property could be used for at least 10 years for construction and remediation of property in downtown Seattle. Report of Proceedings (RP) at 12. Additionally, unlike in Convention Center, whether any portion of the property will ever be sold or leased is not known. In contrast, in Convention Center, a private developer immediately took ownership of three floors of retail space. In this case, for the first 5-10 years, a substantial portion of the property will be put to public use and only after that time is there a possibility that the property may be sold. Furthermore, the record indicates that in other cities that have constructed public monorail transportation systems, surrounding land may need to be owned permanently by the condemning authority due to the particular traffic pattern of monorail stations.
¶ 47 HTK counters, however, that since SMP might sell or lease surplus property, if any, after the monorail is completed, the court is required to undertake a searching judicial review of the necessity of SMP's determination to condemn a fee interest in the property.[17] HTK points to no authority that requires a condemning authority to have a public use planned for property forever. Indeed, long standing Washington law is to the contrary. In Reichling v. Covington Lumber Co., 57 Wash. 225, 106 P. 777 (1910), a property owner brought suit to enjoin logging activity on land that had been condemned earlier by the city of Seattle. Under the original condemnation, the city condemned a separate parcel of the property owner's land for purposes of its Cedar River water system. Nine years later, the city passed an ordinance whereby it granted a license to a private party to construct a logging road on the land. The property owner brought suit to enjoin the private party from entering the land. The court noted, "`[w]here a fee simple is taken, the weight of authority is that there is no reversion, but, when the particular use ceases, the property may, by authority of the state, be disposed of for either public or private uses.'" Id. at 228, 106 P. 777 (quoting JOHN LEWIS, A TREATISE ON THE LAW OF EMINENT DOMAIN § 596, at 765 (2d ed. 1888) and citing 2 JOHN F. DILLON, COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 589, at 690 (4th ed. 1890)).
¶ 48 The court in Reichling also cited Seattle Land & Improvement Co. v. City of Seattle, 37 Wash. 274, 79 P. 780 (1905), finding that "`[w]here property is taken, ... with the intention of using it for a certain purpose specified in the ordinance authorizing the taking, as was done in this case, the city, doubtless, has the authority to change said contemplated use to another and entirely different use, whensoever the needs and requirements of the city suggest.'" Reichling, 57 Wash. at 228, 106 P. 777 (quoting 37 Wash. at 277, 79 P. 780).
¶ 49 Given long standing, well-settled case law in Washington, providing that decisions as to the type of property interest to be acquired are reviewed under the deferential legislative standard, we hold that SMP's determination to condemn a fee interest in HTK's property is a legislative question.[18]

*1178 c. Whether a fee interest is reasonably necessary

¶ 50 The next step is to determine whether the condemnation of a fee interest in the entire property is "necessary" for the public use. SMP correctly cites Welcker, 65 Wash.2d at 684, 399 P.2d 330, for the general rule that if a condemning authority has conducted its deliberations on an action "honestly, fairly, and upon due consideration" for facts and circumstances, that action will not be considered arbitrary and capricious, "even though there be room for a difference of opinion upon the course to follow, or a belief by the reviewing authority that an erroneous conclusion has been reached." Courts will consider costs of the project as a relevant factor. See e.g., Port of Grays Harbor, 30 Wash.App. 855, 638 P.2d 633; Schultz, 356 N.W.2d 846.[19]
¶ 51 In this case, SMP determined that acquisition of the fee interest in property was reasonably necessary and required for the construction, operation, and maintenance of the monorail station on HTP's property and for related construction staging and development of the Green Line alignment in the vicinity of the station. SMP asserts that the SMP board of directors determined that this use was of an intensity and duration to justify the taking of the fee interest.
¶ 52 HTK points to a number of documents that indicate that SMP plans "Associated Development." Associated Development is defined by SMP to mean "a free standing project not connected to a station, built by a third party on land that SMP has fee ownership or some development rights and is most likely built after a station is built. The land can be sold outright or ground leased." CP at 358. HTK notes that SMP has specifically indicated that a portion of HTK's property might yield "surplus property," suitable for Associated Development. The record supports HTK's contention. At a community hearing about this monorail station, "SMP told the community that the residual property would be sold and it did not know yet how the property would be used." Resp't's Ex. 15. The revenue generated from possible transfers of "excess property" was included in SMP's earlier budgets. RP at 102. However, SMP noted in testimony that in a similarly situated property (in downtown Vancouver), the entire footprint outside that monorail station was *1179 used as a park and not developed separately due to the ongoing need for access. RP at 101.
¶ 53 Amicus cite the case City of Cincinnati v. Vester, 33 F.2d 242 (6th Cir.1929), in part for the proposition that excess condemnation, taking more land than is necessary, in order to help recoup the cost of public projects is impermissible. In Vester, the city condemned property to widen a street by 25 feet. The city condemned land within that strip of land and attempted to condemn land outside of the 25-foot strip. The city was prohibited from condemning the excess property. The Sixth Circuit held that the property was only taken in order to sell it (for a private use) at a later date in order to capture the increased value that the widened street would bring. Id.[20]
¶ 54 SMP argues that Vester, 33 F.2d 242, is distinguishable since the city had no public use at all for the property except for possible recoupment. In contrast, in this case, SMP is only condemning property that it has determined is necessary for public use. SMP contends that the evidence demonstrates that the entire property will be used for the construction, maintenance, and operation of the monorail station and the construction staging. Moreover, the proposed station designs include plans encompassing the entire parcel. Given the cost of this undisputed present need of indefinite length and the permanent need for at least a significant portion of the property, SMP contends that the SMP board justifiably determined that the cost of the construction easement could easily eclipse the cost of a fee interest. Testimony as to fair market value of construction easements was undisputed at the hearing. Furthermore, SMP contends that a condemning body may consider financial implications when determining what interests are necessary to condemn, citing Convention Center.
¶ 55 The record supports SMP's contentions that it needs all of the property for a substantial period of time to build and construct a monorail station and may need all of it indefinitely. It is significant that testimony was undisputed that the cost of the temporary construction easement combined with likely cost of damages due to a ground lessee could eclipse the cost of a fee interest. Given the absence of actual or constructive fraud, we hold that SMP's determination to condemn a fee interest in the entire property was necessary to the public use of public transportation.[21]

ATTORNEY FEES
¶ 56 HTK requests attorney fees. RCW 8.25.075(1) provides that a superior court having jurisdiction of a proceeding instituted by a condemnor to acquire real property shall award the condemnee costs including reasonable attorney fees and reasonable expert witness fees if there is a "final adjudication that the condemnor cannot acquire the real property by condemnation." Because we conclude that SMP, the condemnor, can *1180 acquire the property, HTK, the condemnee, is properly denied attorney fees.

CONCLUSION
¶ 57 Consistent with our case law and public policy, courts ensure that property condemned is put to a public use, and the legislature/local governments ensure that such projects are developed in a cost effective manner. This division provides deference to local governments to determine what property is necessary to implement projects that a court has determined are for a public use. This court is both preserving important property ownership rights and ensuring that when a municipal authority condemns property for a public project, such project is truly for the "public use" within the meaning of the Washington State Constitution. Unlike in the recent United States Supreme Court case, Kelo, this case involves one of the most fundamental public uses for which property can be condemned  public transportation. Accordingly, the trial court's finding of public use and necessity is affirmed.
ALEXANDER, C.J., C. JOHNSON, BRIDGE, OWENS and FAIRHURST, JJ., concur.
CHAMBERS, J., concurs in result only.
J.M. JOHNSON, J. (dissenting).
¶ 58 In a recent and highly publicized opinion, the United States Supreme Court justified its denial of federal constitutional protections against eminent domain abuse by acknowledging the states' power to afford their citizens greater protection against such abuse.
[N]othing in our opinion precludes any State from placing further restrictions on its exercise of the takings power. Indeed, many States already impose "public use" requirements that are stricter than the federal baseline. Some of these requirements have been established as a matter of state constitutional law, while others are expressed in state eminent domain statutes that carefully limit the grounds upon which takings may be exercised.
Kelo v. City of New London, ___ U.S. ___, 125 S.Ct. 2655, 2668, 162 L.Ed.2d 439 (2005) (footnote omitted).
¶ 59 In the wake of Kelo, legal scholars and citizens exulted that Washingtonians were insulated from such abuses because the plain language of the Washington Constitution, as previously enforced by this court, afforded broader protection against eminent domain abuse than its federal counterpart. See CONST. art. I, § 16. Unfortunately, the majority of this court is less enlightened than the citizenry or less inclined to restrain public agencies in their taking of private property. I side with the citizens and our Washington Constitution. I therefore dissent.

I. FACTS
¶ 60 Special protection against taking of private property is found in our constitution's article I, section 16 "Declaration of Rights." These protections were enacted to protect citizens from abuse of government powers. The settlers of Washington came here drawn by the opportunity to own their own property and many fled from abusive governments. In this case, we have a good example.
¶ 61 In 1941 an immigrant railroad laborer, Henry T. Kubota, purchased the Seattle Hotel that was situated on real property in Seattle's Pioneer Square, the subject of the present litigation.[1] In the wake of Pearl Harbor, and pursuant to President Franklin D. Roosevelt's Executive Order 9066, 7 Fed. Reg. 1407 (Feb. 25, 1942), Kubota was displaced to a Japanese-American internment camp. See generally Toyosaburo Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (upholding constitutionality of military order implementing Executive Order 9066). Although many internees lost all their possessions during this period, a loyal friend managed Kubota's property, returning it to him after his release.
¶ 62 The Seattle Hotel suffered extensive damage during the earthquake of 1949. Despite Kubota's repairs, the hotel's useful life *1181 had been exhausted by 1960, and it was demolished. Kubota then entered into a long-term lease that proposed the construction of a six-story office building atop a parking garage. To Kubota's disappointment, only the parking garage was constructed, which is now commonly referred to as the Sinking Ship garage. Kubota retained the long-term dream of a larger development. Since Kubota's death in 1989, his descendents have managed the property under his namesake, HTK Management, L.L.C. (HTK).
¶ 63 In 2002, the predecessor of the Seattle Monorail Project[2] (hereinafter Monorail) identified the Sinking Ship parcel as a potential monorail station site. HTK learned this information from a local newspaper rather than being contacted directly by the agency.
¶ 64 Shortly thereafter, HTK expressed its willingness to collaborate with Monorail so that both parties could implement their visions for the parcel  Monorail's station on a fraction of the block, coupled with HTK's redevelopment of the remainder of the parcel. The parties began planning for this complementary development. It appears HTK was more sincere than Monorail, and the agency plans took a different direction.
¶ 65 On April 7, 2004, Monorail passed Resolution 04-16 to acquire the entire Sinking Ship parcel by condemnation. Resp't's Ex. 13, at 8. Three weeks later, on April 28, 2004, Monorail filed a petition against HTK for condemnation in King County Superior Court, seeking a fee interest in the entirety of the parcel. Clerk's Papers (CP) at 3.
¶ 66 On August 13, 2004, HTK filed a motion to dismiss the condemnation action for lack of subject matter jurisdiction on the grounds that Monorail's enabling legislation failed to prescribe the agency's condemnation procedure. CP at 41. The trial court denied both HTK's motion and a subsequent motion for reconsideration. CP at 199-202, 215-16.
¶ 67 On September 13, 2004, the trial court held a hearing on public use and necessity in which Monorail sought to justify its condemnation of the entire parcel. Monorail conceded that the station footprint would occupy only approximately one-quarter to one-third of the parcel.[3] The following diagram is typical of the preliminary designs entered into evidence:
*1182 
¶ 68 Monorail asserted that condemnation of the parcel outside the footprint of the monorail station (remainder property) was needed for construction staging and staff parking activities. Thus, Monorail argued that these purposes of its condemnation constituted a public use.
¶ 69 HTK conceded that both the station and construction staging may be public uses. However, they countered that because construction staging and parking[4] is inherently temporary, Monorail was not justified in condemning a fee interest in the remainder property. Accordingly, HTK urged the court to grant Monorail a fee interest in the station footprint and at most a construction easement on the remainder property.
¶ 70 At the hearing, HTK presented evidence to demonstrate that Monorail sought to condemn more property than necessary in order to profit from the increased value of the parcel after monorail construction. The concept of agency profit from such land transactions was discussed by Monorail from its very inception. The petition creating the monorail noted:
Rights of Way: Market value paid on the limited number of properties that must be acquired, some easements to be purchased, *1183 and high-value properties resold when construction is completed.

Resp't's Ex. 20, at 44 (emphasis added).
¶ 71 Monorail subsequently adopted an internal development policy that anticipated selling "remainder property" to private developers. Referred to as "associated development," Monorail defines it as:
a free standing project not connected to a station, built by a third party on land that SMP has fee ownership or some development rights and is most likely built after a station is built. The land can be sold outright or ground leased.
Resp't's Ex. 12, at 1. After adopting this "associated development" policy, Monorail even sought out "site specific recommendations for [associated] types of development opportunities." Id.
¶ 72 Monorail also emphasized its "associated development" policy in the Design-Build-Equip Contract  the contract to be awarded to the winning bidder for construction of the monorail.[5]
The SMP has and will be acquiring property for Stations and is interested in maximizing the development potential of such properties. In some instances, the SMP will be required to acquire a complete site and may, once the Station is complete, sell or lease a portion of the site to private parties who would develop this excess property for commercial use. This type of development is referred to as "Associated Development."
Resp't's Ex. 26, at DBEC-222 (emphasis added).
¶ 73 In addition to these monorail policies, HTK provided specific evidence that Monorail planned "associated development" for this Sinking Ship parcel. The Transit Way Agreement[6] planned for "[a]ssociated development of the unused portion of the parcel bounded by 2nd Avenue, James Street and Yestler Way (a.k.a., `Sinking Ship Garage.')." Ex. C (Resp't's Ex. 23), at 4. The agreement set "associated development" for the Sinking Ship parcel as a "priority." Id. Moreover, at a Pioneer Square community meeting, the "SMP told the community that the residual property would be sold and it did not know yet how the property would be used." Resp't's Ex. 15.
¶ 74 To this evidence Monorail responded that it had no definitive postconstruction plans for the remainder property and that absent a demonstration of fraud or bad faith, the agency was entitled to condemn the parcel in its entirety. The trial court entered a judgment of public use and necessity. HTK now appeals.

II. ANALYSIS

A. Procedures for Condemnation

¶ 75 Petitioners first assert that the trial court lacked jurisdiction over this matter because Monorail's enabling act fails to expressly prescribe the procedures by which the agency exercises its eminent domain authority. See State ex rel. Mower v. Superior Court, 43 Wash.2d 123, 260 P.2d 355 (1953). With respect to this argument, however, I reluctantly conclude with the majority that lack of such procedures did not deprive the trial court of jurisdiction.
¶ 76 The statute does specify that Monorail could "acquire by ... condemnation." RCW 35.95A.050(1)[7]. Our case law establishes that condemnation procedures may be fairly implied if necessary to effectuate the Legislature's intent. See In re Pet. of Seattle, 96 Wash.2d 616, 629, 638 P.2d 549 (1981) (Westlake). In addition, the differences between procedural statutes are largely inconsequential and "embrace the same procedural theory, namely ... the entry of three separate and distinct judgments during the course of a proceeding." Pub. Util. Dist. No. 1 v. Wash. Water Power Co., 43 Wash.2d 639, 641, 262 P.2d 976 (1953). The determination that Monorail's condemnation procedures may be fairly implied from an express grant of authority does not address the scope of the *1184 condemnation authority. This is a constitutional issue that I believe is determinative here.

B. Scope of Condemnation Authority

¶ 77 Municipal corporations do not possess an inherent power of eminent domain and thus may exercise such power only when expressly authorized to do so by the state legislature. See, e.g., State ex rel. Tacoma Sch. Dist. No. 10 v. Stojack, 53 Wash.2d 55, 60, 330 P.2d 567 (1958). Statutes conferring such power are in derogation of the common right, State ex rel. King County v. Superior Court, 33 Wash.2d 76, 82, 204 P.2d 514 (1949), and "must be strictly construed, both as to the extent of the power and as to the manner of its exercise."[8]State ex rel. Postal Tel.-Cable Co. v. Superior Court, 64 Wash. 189, 193, 116 P. 855 (1911).
¶ 78 Monorail is a special purpose district that performs a single, narrowly circumscribed function: construction and operation of a monorail.[9] The extent of Monorail's condemnation powers are set forth in RCW 35.95A.050(1), which authorizes city transportation authorities:
To acquire by purchase, condemnation, gift, or grant and to lease, construct, add to, improve, replace, repair, maintain, operate, and regulate the use of public monorail transportation facilities, including passenger terminal and parking facilities and properties, and other facilities and properties as may be necessary for passenger and vehicular access to and from public monorail transportation facilities, together with all lands, rights of way, and property within or outside the authority area, and together with equipment and accessories necessary or appropriate for these facilities....
RCW 35.95A.050(1). Although Monorail is entitled to acquire property by "condemnation," the purposes of the condemnation must be for the purpose of "public monorail transportation facilities." In addition, any condemnation must not violate our constitutional prohibition against the taking of private property for private purposes.
Private property shall not be taken for private use.... No private property shall be taken or damaged for public or private use without just compensation having been first made.... Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public.

CONST. art. I, § 16.
¶ 79 To determine whether the use of the eminent domain power is allowed by our constitution, we employ a three-part test:
(1) that the use is really public,
(2) that the public interests require it, and
(3) that the property appropriated is necessary for the purpose.
Westlake, 96 Wash.2d at 625, 638 P.2d 549 (quoting King County v. Theilman, 59 Wash.2d 586, 593, 369 P.2d 503 (1962)). See also State ex rel. Wash. State Convention & Trade Ctr. v. Evans, 136 Wash.2d 811, 817, 966 P.2d 1252 (1998) (Convention Center).
¶ 80 As we are dealing with constitutional rights of the legal owner, the burden of proof is on the condemning agency, not on the condemnee, to demonstrate that the condemnation is for a public use and that it is necessary for that public use. Convention Ctr., 136 Wash.2d at 822-23, 966 P.2d 1252; Theilman, 59 Wash.2d 586, 369 P.2d 503; State ex rel. Sternoff v. Superior Court, 52 Wash.2d 282, 325 P.2d 300 (1958).
¶ 81 As the majority correctly states, the determination that a condemnation is for a *1185 public use is not the same thing as public necessity. See, e.g., Theilman, 59 Wash.2d at 594, 369 P.2d 503 ("`Public use' and `necessity' cannot be separated with scalpellic precision, for the first is sufficiently broad to include an element of the latter."). In article I, section 16 our state constitution directly addresses only the "public use" inquiry. See State ex rel. Puget Sound Power & Light Co. v. Superior Court, 133 Wash. 308, 311, 233 P. 651 (1925). The remaining two inquiries regarding public interest and necessity are judicial corollaries to enforce the constitutional mandate. Unfortunately, the majority errs by greatly blurring the distinctions between the constitutionally mandated inquiry into public use and the judicial corollary of necessity. There are two inquiries: Is this property necessary for the public purpose? Is all this property necessary for the public purpose? Here, the wrong answer to the latter inquiry is given, and a violation of constitutional rights results.

C. Public Use

¶ 82 As previously stated, the inquiry into public use is constitutional in nature. As an initial matter, the majority states that a legislative declaration of public use is "entitled to great weight." Majority at 1175 (citing Hemenway, 73 Wash.2d 130, 437 P.2d 171). It is stupefying that the majority claims that we must give "great weight" to such determinations when our constitution mandates that this "shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public." CONST. art. I, § 16.
¶ 83 Use of the word "shall" is imperative and operates to create a duty rather than to confer discretion. See, e.g., Crown Cascade, Inc. v. O'Neal, 100 Wash.2d 256, 668 P.2d 585 (1983). Moreover, "regard" is defined as "to look at," "show respect or consideration for," "to take into consideration or account," or "to pay attention." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1911 (2002).
¶ 84 Thus, when our constitution states that the courts must make this determination "without regard to any agency's legislative assertion," it means that we must not show deference to the legislative assertion of public use; we decide the question independently. The plain language of our constitution does not require any deference and in fact mandates exactly the opposite. To the extent that this assertion by the majority is based on erroneous jurisprudence, it defies the plain language of our constitution and should be overruled. Not surprisingly, more persuasive case law also supports the contrary conclusion, that the question is judicial.[10]
¶ 85 Although we have not settled onto one single definition of public use, we have always indicated it means more than mere beneficial use. Westlake, 96 Wash.2d at 627, 638 P.2d 549. In Convention Center, we explained the constitutional test for adjudicating public use.
Article I, section 16 prohibits the taking of private property for private use. Thus, this court must ensure that the entire parcel subject to the eminent domain proceedings will be employed by the public use. *1186 The relevant inquiry is whether the government seeks to condemn any more property than would be necessary[11]to accomplish the purely the public component of the project. If the anticipated public use alone would require taking no less property than the government seeks to condemn, then the condemnation is for the purpose of a public use and any private use is incidental.
Convention Ctr., 136 Wash.2d at 822, 966 P.2d 1252 (emphasis added). In other words, our constitutionally mandated public use inquiry seeks to determine whether the government is condemning any more real property than needed for the project.
¶ 86 The rule as articulated in Convention Center has deep roots in our eminent domain jurisprudence. For example, in Stojack, 53 Wash.2d at 63-64, 330 P.2d 567, we stated that:
[p]ublic education is a public use for which private property may be appropriated under the power of eminent domain. If an attempt is made to take more property than is reasonably necessary to accomplish the purpose, then the taking of excess property is no longer a public use, and a certificate of public use and necessity must be denied.
Accord 9 NICHOLS ON EMINENT DOMAIN § 32.05 (3d ed.2005); City of Pullman v. Glover, 73 Wash.2d 592, 595, 439 P.2d 975 (1968) ("[T]he extent of the taking may be no greater than is reasonably necessary for the stated public purpose.").
¶ 87 This same rule has also been reiterated with respect to the interest to be acquired.
When a legislature delegates to any subordinate agency, such as a municipality or a public service corporation, the right and authority to exercise the power of eminent domain, it ordinarily defines the estate or interest to be appropriated, having power to authorize the taking of a complete fee simple title, a qualified fee, or an easement only. When it has prescribed by statute the extent of interest to be vested, none further can be taken. Courts in construing statutes which grant the power, and authorize the taking of a certain estate or interest, enforce the rule of strict construction, permitting no greater title or interest to vest than has been expressly authorized or may be necessary to the contemplated public use. When an easement will be sufficient, no intendment or rule of liberal construction will be indulged to support an attempt to obtain any greater interest or estate.

Neitzel v. Spokane Int'l Ry. Co., 65 Wash. 100, 105, 117 P. 864 (1911) (emphasis added). We have also stated the rule as follows:
"Inasmuch as property cannot constitutionally be taken by eminent domain except for the public use, it follows that no more property shall be taken than the public use requires; and this rule applies both to the amount of property and the estate or interest in such property to be acquired by the public. If an easement will satisfy the requirements of the public, to take the fee would be unjust to the owner, who is entitled to retain whatever the public needs do not require, and to the public, which should not be obliged to pay more than it needs."

City of Seattle v. Faussett, 123 Wash. 613, 618, 212 P. 1085 (1923) (emphasis added) (quoting 10 Ruling Case Law 88). Accord State v. Larson, 54 Wash.2d 86, 89, 338 P.2d 135 (1959) ("no greater estate or interest should be taken than is reasonably necessary to accomplish the public use or necessity."); State ex rel. Eastvold v. Superior Court, 48 Wash.2d 417, 294 P.2d 418 (1956).
¶ 88 The above case law is unequivocally clear: if a government entity seeks to condemn more property than is needed, the excess property is not for a public use and may not be lawfully condemned. This rule is so well engrained that we have called it a "universal rule." City of Tacoma v. Humble Oil & Ref. Co., 57 Wash.2d 257, 356 P.2d 586 (1960).
*1187 ¶ 89 Unfortunately, the majority disregards this "universal rule" of our eminent domain jurisprudence. The majority correctly states that a legislature's grant of eminent domain power to a municipality is to be strictly construed but immediately backpedals to avoid construing that authority so strictly as to actually restrict the agency. Majority at 1171. The majority cannot show that following our "universal rule" here, by allowing Monorail to condemn only the property interests necessary to accomplish its purposes (a fee in the station footprint and, at most, construction easement in the remainder), would "defeat the purpose of the legislative grant." The contrary conclusion is further supported by the fact that other monorail station sites do not require an entire block for "staging and staff and labor parking."
¶ 90 More importantly, however, the majority would destroy our "universal rule" by stating that "decisions as to the amount of property to be condemned are legislative questions, reviewed under the legislative standard of necessity."[12] Majority at 1176-77. It finally concludes that declarations of necessity by a condemning agency are conclusive absent fraud or arbitrary and capricious conduct. This is abdication of the court's constitutional duty.
¶ 91 If, as the majority suggests, decisions as to the extent of property to be condemned fall under necessity, and judicial review is properly characterized by deference, there are no effective means by which the courts may carry out the constitutionally mandated independent inquiry into public use. If the majority seeks to overrule our "universal rule," it should do so explicitly.
¶ 92 Moreover, precedential support for the majority's conclusion is lacking. Specifically, the majority's reliance on Humble Oil and In re Port of Grays Harbor, 30 Wash. App. 855, 638 P.2d 633 (1982), for the proposition that decisions as to the amount of property to be condemned as legislative questions, reviewed under the deferential standard are misplaced. Nor are these cases controlling as the majority suggests.
¶ 93 In Humble Oil, 57 Wash.2d at 257, 356 P.2d 586, the city of Tacoma developed a hydroelectric project on the Cowlitz River in order to meet the city's electricity needs. Because the reservoir behind the dam would inundate the condemnee's land, the city sought to condemn a fee interest in the portion to be inundated. Although the condemnee stipulated that the hydroelectric project was a public use, he argued that he should be able to retain the mineral rights under the inundated land. In contrast, the city argued for a fee simple on the grounds that without a fee it could not "operate and control the reservoir satisfactorily," including concerns over pollution, subsidence, loss of fish life, among others. Id. at 259, 356 P.2d 586. The court granted an order of public use and necessity. The reason that the court determined that it would not interfere with the "selection" of land was precisely because doing so would interfere with the very purpose of the project, by creating pollution, etc. The same cannot be said for the instant case.
¶ 94 The majority also relies on Port of Grays Harbor. Not only is Port of Grays Harbor a Court of Appeals case that is not binding on this court, the case doesn't even purport to construe article I, section 16 of our state constitution. Rather, it interprets article VIII, section 8, which is a separate broad constitutional grant of condemnation authority only to port districts. That grant is so broad that the condemnation of property for industrial development and trade, normally understood as private uses, is often *1188 argued to be public use when part of a port development.
¶ 95 Because Humble Oil and Port of Grays Harbor offer insufficient support for their proposition, the majority relies on case law from various other states to support its claim that the condemning authority's decision as to the extent of the property interest is a legislative question. Majority at 1176. It appears that the majority is not interested in our Washington Constitution but would rather cite to cases from other states that support its conclusion, even though those states have different constitutional provisions.
¶ 96 Because Washington Constitution article I, section 16 is clearly unique, we have previously refused to apply case law from other states to interpret it. See Westlake, 96 Wash.2d at 627, 638 P.2d 549 (rejecting the use of cases from other jurisdictions to interpret article I, section 16 because such cases "are not helpful."). The plain language of our constitution was chosen by our settler forefathers to provide one of the strongest mandates against the taking of private property for private use in the nation.
The judicial determination clause in the Washington Constitution is a clause currently existing in only four other states.[13] At the time of the 1889 Washington Convention, only Colorado and Missouri had similar provisions. It is not entirely clear why such a provision was included in Washington's only constitutional restriction on the sovereign's otherwise limitless eminent domain power.... The only motion relative to this provision in the convention was an attempt to strike out any reference to the legislature. It failed. However, the clear language of the provision, with its difference from most other constitutions and early cases, shows that the constitutional framers sought to place a limit on the legislature by assigning the judiciary the duty to determine the character of proposed public uses.
James M. Dolliver, Condemnation, Credit, and Corporations in Washington: 100 Years of Judicial Decisions  Have the Framers' Views Been Followed?, 12 U. Puget Sound L.Rev. 163, 175-76 (1989) (footnotes omitted).
¶ 97 The majority cites Reichling v. Covington Lumber Co., 57 Wash. 225, 106 P. 777 (1910) for the proposition that an immediate public use, even if only temporary, justifies the condemnation of a fee. However, in Reichling, the property had already been condemned years prior to the action, and the real issue was whether collateral attack on the condemnation was proper. In Reichling, as in all other cases addressing this matter, the use intended was not inherently temporary and at least had the potential to be of indefinite duration. Here, construction use is clearly, and admittedly, temporary.
¶ 98 Finally, the majority also reasons that Monorail was entitled to take a fee in the remainder property because it determined that it would be less expensive to do so. However, the amount that property costs does not determine whether it is a public use. Cf. Westlake, 96 Wash.2d at 627, 638 P.2d 549 ("A beneficial use is not necessarily a public use."). Moreover, no actual cost figures were given, and this opinion was *1189 lay testimony  neither qualified nor admitted as expert opinion.
¶ 99 Our "universal rule" states that when a government agency seeks to condemn more property than required for legitimate public purpose, the excess is not for a public use. Here, not only does Monorail have an "associated development" policy that encourages excess condemnation for subsequent resale for private use at a profit, but the agency has made such condemnation a "priority" for the Sinking Ship parcel. Monorail's sole justification for condemning a fee in this portion of the parcel is the inherently temporary use of construction staging and staff and labor parking. The real purpose is to profit from the later sale.[14]
¶ 100 The majority cannot point to a single case approving the condemnation of a fee interest for an inherently temporary use where the condemning agency has a policy of condemning excess property for subsequent resale for private use. The proposition is most reminiscent of Westlake, in which this court disapproved such a condemnation proposal.
¶ 101 I would hold that under article I, section 16, anything beyond a fee simple in the footprint of the monorail station is not a public use. The constitution of our forefathers and Kubota's legacy requires this conclusion. The order of public use and necessity should be reversed on this basis alone.

D. Necessity for this public use

¶ 102 Even assuming that Monorail had proved a public use in the entirety of the parcel, it still cannot prove necessity. The majority's analysis regarding necessity is as flawed as its public use analysis.
¶ 103 Unlike the inquiry into "public use," which is a constitutional mandated inquiry, the inquiry into necessity is a corollary judicial construct. As stated by the majority, several determinations of necessity have been upheld absent actual fraud. Majority at 1175. Yet, the majority fails to note other grounds upon which we overturn findings of necessity. Besides fraud, a declaration of necessity is not upheld where there is arbitrary or capricious conduct, manifest abuse of discretion, violation of law, improper motives, or collusion. Stojack, 53 Wash.2d 55, 330 P.2d 567. Here, I would hold that the record establishes that Monorail's action is arbitrary and capricious and based upon improper motives.
¶ 104 Arbitrary and capricious conduct is defined as ""willful and unreasoning [action] and taken without regard to the attending facts or circumstances." " Wash. Indep. Tel. Ass'n v. Wash. Utils. Transp. Comm'n, 149 Wash.2d 17, 26, 65 P.3d 319 (2003) (quoting Rios v. Dep't of Labor Indus., 145 Wash.2d 483, 501, 39 P.3d 961 (2002) (quoting Hillis v. Dep't of Ecology, 131 Wash.2d 373, 383, 932 P.2d 139 (1997))). Monorail has unquestionably engaged in arbitrary and capricious conduct as evidenced by the fact that it seeks to condemn the Sinking Ship property before it has even finalized plans for the station and where the agency has admitted that the station footprint will use only one-quarter to one-third of the parcel. See supra note 3.
¶ 105 In Port of Everett v. Everett Improvement Co., 124 Wash. 486, 214 P. 1064 (1923), the newly formed Port of Everett sought to condemn property to carry out its purposes but had not formed any definitive plans for property to be condemned. The enabling statute of the port stated that it could condemn only property "necessary for the purposes of the port district." The court reasoned that:
where the grant is of power to acquire only necessary property, there must be a showing that the particular property sought to be acquired is thus necessary, and without some definite stated plan of improvement, this necessity cannot be shown. So here, since there is no such definite plan, it is impossible for the court or anyone to know whether all or what particular part of the property here sought to be condemned is necessary for the use of the port district, and the right of condemnation must fail for this reason.

Everett Improvement, 124 Wash. at 494, 214 P. 1064 (emphasis added).
*1190 ¶ 106 Here, Monorail argued that there "is no requirement that a condemning authority must have a final design demonstrating use of the entire site before a condemnation can proceed forward." Br. of Resp't at 37. Monorail's argument is answered by Everett Improvement.
¶ 107 Like the Everett Improvement, the monorail enabling legislation authorizes the agency to condemn only that property which is "necessary or appropriate for [its] facilities." RCW 35.95A.050(1). Monorail repeated numerous times at the public use hearing that it had no definitive plans for the entirety of the Sinking Ship parcel except for the inherently temporary purpose of construction.[15]
¶ 108 By allowing premature condemnation of the remainder property, the majority implicitly approves the practice of an agency maintaining plans as vague as possible in the hopes of acquiring excess property to generate additional revenue. The lack of a definitive plan alone is fatal to the attempted condemnation and should be held arbitrary and capricious.
¶ 109 I would also find that Monorail's policies for associated development (by private parties), combined with the agency's insistence on a fee interest even in the absence of a definitive plan, show improper motives. Monorail intended to infringe the constitutional rights of the property owner here to take property which would appreciate and then be resold by the agency in order to help finance its troubled project. This is not a proper motive since the enabling legislation specified the authorized funding sources and did not authorize Monorail to finance its project through real estate speculation (nor could it constitutionally).

III. CONCLUSION
¶ 110 The court has, until today, upheld a "universal rule," which states that if a government agency seeks to condemn more private property than required for its public purposes, the excess is not for a public use. Under our constitution, "[w]henever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public." CONST. art. I, § 16.
¶ 111 By upholding Monorail's decision to take far more property than it needs from a lawful private owner, and by erroneously applying a deferential standard to the agency's grab of this property, the majority overrules this court's "universal rule" sub silentio. I would uphold our constitution and agree with the property owner that Monorail (and other agencies of its ilk) should be restrained from abusing private property rights. As demonstrated by Kubota and his legacy, such rights are of exceptional import to our citizens. I believe the authors of our constitution understood this vital principle and drafted and overwhelmingly approved article I, section 16 to protect against such abuse. I dissent.
NOTES
[1] Contrary to the dissent's view, the facts and legal issues in this case bear no resemblance to the recent decision in the United States Supreme Court in Kelo v. City of New London, ___ U.S. ___, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). In Kelo, the City of New London condemned property in order to develop a certain area of the city, which included the condemnation of property in order to build a private hotel and new private residences to be owned by new home owners. Id. In contrast, in this case, the property is being condemned to build a public monorail, an undisputed, historic public use.
[2] Ass'n of Wash. Business, WashACE 2002 Competitiveness Report: "Will Washington Shrug?", Transportation at http://www.awb.org /policy/competitive ness/2002reportmain .htm (last visited Oct. 18, 2005).
[3] Id.
[4] Currently there is a one-mile monorail system in Seattle, operating between Seattle Center and downtown Seattle. This monorail was built for the World's Fair held in Seattle in 1962.
[5] City of Seattle Proposition No. 2 (Initiative 53: The Monorail), City Attorney's Explanatory Statement (Nov. 7, 2000), King County Records, Elections & Licensing Servs. Div., King County On-Line Voter's Pamphlet, available at http://www.metrokc. gov/elections/2000 nov/pamphlet/pamph. htm (as of Oct. 18, 2005).
[6] Id.
[7] Id.
[8] City of Seattle Initiative No. 83, City Attorney's Explanatory Statement (Nov. 2, 2004), King County Records, Elections & Licensing Servs. Div., Voter's Pamphlet-Ballot Measures, General and Special Elections, available at http://www.metrokc. gov/elections/ pamphlet/1204/ index.htm (as of Oct. 18, 2005).
[9] Official Final Results, City of Seattle Initiative No. 83 (Nov. 2, 2004), King County General and Special Election Results, available at http:// www.metr okc. gov/elections/2004 nov/resPage16.htm (as of Oct. 18, 2005).
[10] Amicus curiae briefs were submitted by the Institute for Justice Washington Chapter and by Paul and Josephine Fiorito.
[11] A municipality has no power to condemn outside its limits in the absence of express authority to do so. Hemenway, 73 Wash.2d at 138, 437 P.2d 171.
[12] An initiative passed by the electorate is the same exercise of sovereignty as that exercised by the legislative authority. Maleng v. King County Corrs. Guild, 150 Wash.2d 325, 330, 76 P.3d 727 (2003).
[13] We cite the case of Fur Breeders only to demonstrate that other statutes might provide the method or procedure necessary to carry out the condemnation authority.
[14] The dissent concedes that this test is the proper test to be used by this court in eminent domain proceedings.
[15] The dissent concedes that construction of the public monorail is a public use.
[16] The dissent criticizes the majority for citing out-of-state cases. Contrary to the dissent's claims, under long standing Washington jurisprudence out-of-state cases, while not controlling, are instructive. See, e.g., Welcker, 65 Wash.2d at 683, 399 P.2d 330 (citing out-of-state cases on eminent domain that follow Washington principles); Thomas, 42 Wash. at 525, 85 P. 256 (same).
[17] The dissent concedes that the Washington Constitution article I, section 16 contains the term "public use" and does not include the term "public necessity."
[18] The dissent criticizes the majority and claims that the majority is "blurring" the distinctions between the constitutionally mandated inquiry into whether the use is a "public use" and the judicial corollary determining whether the condemnation is "necessary." But, it is the dissent that blurs the distinction. The dissent agrees that this court employs a three-part test to determine whether a condemnation is constitutional. Yet, in derogation of its own statement of law, it conflates the third prong of the test  the necessity question  into the first prong of the test. The dissent would read the "public use" prong to make two inquiries: (1) is the use public and, if so, (2) is the government condemning more real property than is "needed." However, as discussed above, under long standing Washington case law including Convention Center, Westlake, Humble Oil, Welcker, Hemenway, and Dickgieser, these two inquiries are separate questions and are analyzed by this court under two different standards.

In a similar vein, the dissent cites Humble Oil, claiming that Humble Oil contains a "universal rule" which is separate from the three-prong test discussed above. The dissent is again mistaken. The dissent artfully fails to explain this court's holding in Humble Oil, that "manifest abuse of discretion was not found" with this court providing the same deference given to legislative questions of "necessity." See also State ex rel. Tacoma Sch. Dist. No. 10 v. Stojack, 53 Wash.2d 55, 330 P.2d 567 (1958) (dissent again fails to mention this court's deference to legislative determinations as to the selection of land "reasonably necessary" and that manifest abuse of discretion was not found). Furthermore, the dissent fails to explain the context and holding of Neitzel v. Spokane International Ry. Co., 65 Wash. 100, 117 P. 864 (1911). Unlike in this case and other cases cited by the majority above, Neitzel involved a determination years after the fact of whether a railroad had obtained a fee interest or an easement in property at a time when the extent of interests railroads could acquire in property was unclear.
[19] The dissent concedes that this court has upheld various determinations of what constitutes necessity. "Necessity" requires only that the condemning authority show that the condemned property was "reasonably necessary" for the public use, not that it was absolutely necessary or indispensable. See, e.g., Welcker, 65 Wash.2d at 684, 399 P.2d 330 (the necessity requirement "embraces the right of the public to expect and demand the service and facilities to be provided by a proposed acquisition or improvement"; "[r]easonable necessity for use in a reasonable time is all that is required"). Thus, the property here is "reasonably necessary" for the public transportation project given that all of the property will be used initially for the construction of the monorail and a significant portion, and perhaps all, of the property will be used indefinitely for the monorail station and access to the station.
[20] The United States Supreme Court affirmed, on narrower grounds. City of Cincinnati v. Vester, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950 (1930) (concluding that the proceedings for excess condemnation of the properties involved in the suits were not taken in conformity with the applicable law of the state and affirming the decrees below upon that ground.)
[21] The dissent erroneously claims that SMP has engaged in arbitrary and capricious conduct. First, as discussed above, an action taken by a municipality after proper procedural consideration is not arbitrary or capricious, even though a reviewing court may believe it is erroneous. See Welcker, 65 Wash.2d at 684, 399 P.2d 330. In this case, HTK is not alleging that SMP's decision-making process was improper. Second, the dissent's reliance on Port of Everett v. Everett Improvement Co., 124 Wash. 486, 214 P. 1064 (1923) is misplaced. Unlike the condemning authority in that case in which there was no plan for any type of current or future construction or improvement, SMP has developed a plan for using the entire property  building the monorail. Moreover, nothing in Everett Improvement requires this court to find that the failure to have in place a definitive use plan for the entire life of the property makes the condemning authority's actions arbitrary and capricious. Second, the fact that SMP may sell or lease a part of the condemned property at some future point does not show an unconstitutional improper motive. As discussed above, in Convention Center, this court upheld the condemning entity's agreement, up front, to sell three of the four floors of the convention center to private commercial interests. Here, there is no agreement for sale and, in contrast, there is an immediate use of the entire property for construction, staging, alignment, and future operation of a monorail station.
[1] The parcel in question is located in historic Pioneer Square and is triangular in shape. See Pet'rs' Ex. 2, at 5. It is bordered by 2nd Avenue, James Street, and Yesler Way. Id.
[2] The Elevated Transportation Company is the predecessor of Monorail. See City of Seattle Proposition No. 2 (Initiative 53: The Monorail). Although Monorail operates entirely within the City of Seattle, the agency is an independent municipal corporation. See majority at 1171; RCW 35.95A.020.
[3] The majority's fact section states that "preliminary designs show the station footprint covering the entire property, other more recent designs show a smaller footprint." Majority at 1170. Although technically correct, this statement is misleading. The former are unquestionably no longer under any serious consideration. See Br. of Resp't at 7 n.13 ("depending on the ultimate station design, approximately 6,500 to 10,000 square feet of the approximately 20,000 square foot parcel will be covered by the station footprint."). See also Report of Proceedings (RP) at 54 ("THE COURT: The bottom line is the footprint of the Yesler station is not going to take the entire triangle of the Yesler property? THE WITNESS: That's correct.").
[4] This is temporary parking and not long-term parking for monorail patrons. See "staff and labor parking" on preceding diagram. There will be substantially less parking than the present public garage.
[5] There was actually only one bidder.
[6] The Transit Way Agreement between the City of Seattle and Monorail establishes conditions under which Monorail may use the city's rights-of-way.
[7] Fully quoted infra p. 1184.
[8] All delegations of state authority are to be construed strictly, and this is "`especially true with respect to the power of eminent domain, which is more harsh and peremptory in its exercise and operation than any other.'" State ex rel. Chesterley v. Superior Court, 19 Wash.2d 791, 800, 144 P.2d 916 (1944) (quoting JOHN LEWIS, 1 A TREATISE ON THE LAW OF EMINENT DOMAIN IN THE UNITED STATES § 388, at 708 (3d ed.1909)).
[9] The majority suggests, for example, that the agency could create a park out of the excess Sinking Ship property. However, under our cases, construction of a park likely exceeds Monorail's enabling legislation.
[10] We have stated on numerous occasions that "[s]tate cases and statutes from the time of the constitution's ratification, rather than recent case law, are more persuasive in determining" the protections of a constitutional provision. Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 120, 937 P.2d 154 (1997). Our early jurisprudence demonstrates that legislative determinations of public use are not entitled to great weight. See, e.g., Decker v. State, 188 Wash. 222, 227, 62 P.2d 35 (1936) ("[W]hether the use be `really public' is for the courts to determine, and in the determination of that question they will `look to the substance rather than the form, to the end rather than to the means.'" (quoting State ex rel. Puget Sound Power & Light Co. v. Superior Court, 133 Wash. 308, 233 P. 651 (1925))); State ex rel. Andersen v. Superior Court, 119 Wash. 406, 410, 205 P. 1051 (1922) ("The legislature can declare in the first instance that the purpose is a public one, and it remains the duty of the court to disregard such assertion if the court finds it to be unfounded."); Langdon v. City of Walla Walla, 112 Wash. 446, 456, 193 P. 1 (1920) ("We shall assume that the question of public use is a judicial question in Oregon, as it is in our state, and that such question has been and will be decided by the courts of that state...."); Healy Lumber Co. v. Morris, 33 Wash. 490, 501, 74 P. 681 (1903) ("Under such circumstances the case comes to the court without any presumption one way or the other on the subject of public use, but is to be tried by the court like any other question that is submitted to its discretion.").
[11] The use of the term "necessary" is unfortunate because it is also a term of art in eminent domain jurisprudence. However, there can be no equivocation that this analysis in Convention Center was regarding public use and not necessity. This analysis was completed specifically under the header of "public use" and was later followed by a separate section on "necessity."
[12] Remarkably, the majority does this after attempting to distinguish Convention Ctr., 136 Wash.2d 811, 966 P.2d 1252. As previously quoted, Convention Center held the correct test for inquiries into public use: "[T]his court must ensure that the entire parcel subject to the eminent domain proceedings will be employed by the public use. The relevant inquiry is whether the government seeks to condemn any more property than would be necessary to accomplish purely the public component of the project." Convention Ctr., 136 Wash.2d at 822, 966 P.2d 1252. The majority attempts to distinguish Convention Center by observing that it dealt with alleged permanent public use within the footprint of the project. The majority cannot explain, however, why these observations change our "universal rule" that determining whether excess property has been condemned is analyzed under a constitutionally mandated inquiry into public use, and not the deferential judicial construct of necessity.
[13] Ariz. Const. art. II, § 17 ("Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public.").

Colo. Const. art. II, § 15 ("[W]henever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public."). See also Pub. Serv. Co. of Colo. v. City of Loveland, 79 Colo. 216, 245 P. 493 (1926).
Miss. Const. art. III, § 17 ("[W]henever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public.").
Mo. Const. art. I, § 28 ("[W]hen an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public.").
[14] Providing Monorail staff free parking in Pioneer Square is unlikely to be a public use.
[15] See, e.g., RP at 22 ("We haven't done any planning."); RP at 23 ("There has been no determination at all in our minds at this point .... There are no plans for development on this site."); RP at 77 ("I think the way I would word that is that we are trying to leave our options open...."); RP at 78 ("We have no intention at this time of doing anything with the property specific .... One of the possibilities could be access, one could be a park, one could possibly be selling off residuals sometime in the future."); RP at 122 ("At the moment no uses appear to me if there is a remainder, what our use of that would be").