**FILED**
**DECEMBER 10, 2024**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| YAKIMA COUNTY, | ) | |
| | ) | No. 39613-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID M. CHURCH, et al., | ) | UNPUBISHED OPINION |
| | ) | |
| Appellants. | ) | |

COONEY, J. — Yakima County (County) sought to acquire portions of David and Penny Churches' (Churches) real property for a road widening and signalization project (Project) for Terrace Heights Drive, a main thoroughfare in the Terrace Heights area of Yakima, Washington. When the parties failed to reach an agreement on the County's acquisition of the Churches' property, condemnation proceedings ensued. Ultimately, the court entered an order adjudicating public use and necessity, concluding that the Project was a public use, and that the Churches' property was necessary for the Project.

The Churches appeal, arguing that the Project is not a public use and does not require their property. They contend that the signalization of the intersection only

benefits Falcon Ridge, a neighboring commercial developer, and that the Project is an illegal gift of public funds. We disagree and affirm.

BACKGROUND

Terrace Heights Drive is an east-west public road located in Yakima County, Washington, that is comprised of two lanes in each direction. The Churches' property is located approximately one block west of South 39th Street and is bounded to the north by Terrace Heights Drive. Ex. PE-1 at 38. The land directly east of the Churches' property is owned by Falcon Ridge Investments, LLC (Falcon Ridge). There is an existing public roadway, Terrace Park Drive, that intersects Terrace Heights Drive, almost directly north of the Church-Falcon Ridge property line. Some portions of Terrace Heights Drive include a center turn lane, but the area between North 33rd Street and South 41st Street does not.

In 1999, the County adopted the Terrace Heights Neighborhood Plan (THNP). The THNP was created to guide future development in Terrace Heights and recognized that, "[a]lthough there are several north and south routes in and out of Terrace Heights, Terrace Heights Drive is the main east/west transportation link between downtown [Yakima] and Terrace Heights." Ex. PE-1 at 280, 284. It also noted that "[t]here are several places in Terrace Heights where traffic congestion has become concerns [sic] residents . . . Terrace Heights Drive is one example" and "the County identified the need

for additional traffic capacity in the Terrace Heights area [due to future residential developments]." Ex. PE-1 at 288.

In 2001, the Terrace Heights Corridor Study (THCS) was completed for the Yakima County Department of Public Works. The THCS recognized that the "[s]teadily growing traffic volume on Terrace Heights Drive has caused increased congestion, delay, inconvenience, and hazard for its roadway users." Ex. PE-1 at 134. It also found that "[d]eteriorating access to vital public safety, security, and emergency response services both locally and to the City of Yakima is a growing concern." Ex. PE-1 at 134.

In 2018, Falcon Ridge applied to the County for a conditional use permit (CUP) related to a proposed development for a "retail/service multi-use shopping center and grocery store." Ex. PE-9. In the application, Falcon Ridge proposed that "[p]rimary access to the site will be via a controlled intersection at Terrace Heights Drive." Ex. PE-9.

The County and Falcon Ridge discussed the road acquisition and improvements that would need to be made to Terrace Heights Drive. The Board of County Commissioners (Board) proposed that the County could fund the remainder of the Project if Falcon Ridge was willing to "participate financially" by paying for signalization of the intersection. A memorandum of understanding (MOU) was drafted between the County and Falcon Ridge which stated in relevant part:

> This [MOU] sets the terms and understanding between Yakima County and Falcon Ridge Investments, LLC to partner in the widening of Terrace Heights Drive to five lanes between the vicinity of 34th Avenue and 39th Avenue. In addition, a signalized intersection will be built at the intersection of Terrace Park Drive.
>
> . . . .
>
> **Terms and Understanding**
>
> 1. Yakima County, using SIED funds, will widen Terrace Heights Drive to a full five lane section and construct a new, signalized intersection of Terrace Park Drive, the access to the Falcon Ridge property and Terrace Heights Drive.
>
> 2. Falcon Ridge Development will pay 10 percent of the total cost, not to exceed $250,000. This cost is inclusive of the Right of Way acquisition, PS&E and construction.
>
> . . . .
>
> This MOU is not a commitment of funds by either party.

Clerk's Papers (CP) at 55. Thereafter, Falcon Ridge's CUP application was approved by the County subject to some conditions.

Shortly after the approval of Falcon Ridge's CUP application and following a public hearing, the Board passed resolution 411-2018 which amended the County's six-year transportation improvement plan to include the widening of Terrace Heights Drive between North 33rd Street and North 39th Street to add a center turn lane and to "[s]ignalize [the] [i]ntersection." Ex. PE-1 at 52. Later, the Board adopted resolution 418-2018 in which it found that the addition of a center turn lane to Terrace Heights Drive between North 33rd Street and North 39th Street "will provide improved access to

4

existing land owners and expanded development opportunities for surrounding underdeveloped commercial properties." Ex. PE-1 at 43.

After the Project was added to the transportation improvement plan, the County began exploring how much land it would need to acquire for the Project. The County discovered that the Project required acquisition of right of ways from six parcels of land. Of those six parcels, two are owned by Falcon Ridge and one by the Churches.

The County began negotiating with the Churches to acquire the land necessary for the Project. The County made several offers to the Churches, but none were accepted. Because the Churches and the County could not reach an agreement, the Board considered and ultimately adopted resolution 009-2022 to commence condemnation proceedings to acquire the necessary portions of the Churches' property during an open public meeting in 2022.

Resolution 009-2022 states the Project "is in the best interests of the citizens of Yakima County as determined by the [Board] and Yakima County Engineer as part of a Yakima County approved Six-Year [transportation improvement plan]" and the Churches' property is "necessary for construction of the project." Ex. PE-1 at 7, 10. It also declared the "construction of the project is a public use." Ex. PE-1 at 10. It therefore directed the County to "commence [the] condemnation proceedings to acquire the necessary rights-of-way and property interests" from the Churches. Ex. PE-1 at 10.

A few months later, the County commenced a condemnation action to acquire the Churches' property. The condemnation petition sought "an order . . . adjudicating that the contemplated use for the lands, real estate, property, and property interests sought to be appropriated by this petition is a public use of Yakima County and that said property and property interests are necessary for the public use of Yakima County." CP at 7. The Churches objected to the County's request for an order establishing public use and necessity. A hearing was held on the matter.

At the hearing, the Churches primarily took issue with the corner portion of their property that the County sought to acquire for signalization of the intersection. During the hearing, the County offered, among other documents, the THNP, the THCS, resolutions 411-2018, 418-2018, and 009-2022, the County's plan for the Project, the MOU, and aerial images and drawings of the Project into evidence. Ex. PE-1, PE-5-PE-9. The County engineer, Matthew Pietrusiewicz, Mr. Church, and Craig Nance[1] testified at the hearing.

Mr. Pietrusiewicz testified that the addition of a center turn lane "improves capacity for the road and it reduces points of conflict for the motoring traffic." Rep. of

---

[1] Resolution 009-2022 authorized condemnation of a portion of the Nances' property for the Project, but this proceeding has not been initiated yet. The Nances were, however, named as respondents in the condemnation action against the Churches because they have a "possible utility easement" in the property the County seeks to acquire from the Churches. CP at 6.

6

Proc. (RP) at 18. In addition, he opined that the center turn lane reduces "[r]ear-end collisions primarily, as well as—if you sit in a turn lane you—you can make a better decision on when to turn." RP at 18. He testified that no more land than was necessary for the Project was being sought by the County from the Churches.

As to the traffic signal, Mr. Pietrusiewicz testified that placing it at a different location, namely South 39th Street, would not work as well because it would be too close to an existing traffic signal, and the traffic signals are "better spaced out." RP at 49. He stated:

> Q. You can't have an access to Terrace Park closer to the intersection because of your road design standards?
>
> A. Right.
>
> Q. So the area that you're taking in this condemnation is the area necessary to provide appropriate separation from the intersection and access to the commercial property?
>
> A. Correct.
>
> Q. Why didn't you go further?
>
> A. Didn't see a need at this time.

RP at 54. Mr. Pietrusiewicz further testified the signalization of the intersection was to address the influx of traffic that would be generated from the Falcon Ridge development:

> Q. And then it indicates in addition, a signalized intersection will be built at this intersection of Terrace Park Drive. And we talked about that earlier. You have indicated that the signal which was required solely for the purpose of addressing traffic generated from the commercial development, correct?
>
> A. Yes.

Q. The widening project in dealing with the pinch point could be accomplished without a signal?

A. Yes.

RP at 59.

Following the hearing, the court entered an "Order Adjudicating Public Use and

Necessity and Setting Trial Date." CP at 80-85. The court found, in relevant part:

3. The County's decision to design and construct the Project was based on considerations that serve the community of Terrace Heights and the public of the County as a whole.

4. These considerations include benefits to the traveling public that will result from adding a center turn lane to Terrace Heights Drive where that road is currently four lanes wide and lacks a center turn lane. The benefits of a center turn lane include reduced delays to traffic, reduced risk of rear-end collisions due to motorists stopped to make turns, and increased safety by providing physical separation between opposing lanes of traffic.

. . . .

6. Opportunities for the improvement of these tracts of land, and particularly the tracts of land south of Terrace Heights Drive in the vicinity of the Project's proposed extension of Terrace Park Drive, are consistent with longstanding economic development goals of the County. These development goals are in furtherance of broad community planning documents, which reflect community goals and policies to provide for new and expanding firms wishing to utilize commercial and industrial sites in the County. Improved opportunities for commercial and industrial land use have been specifically endorsed in planning documents associated with the Terrace Heights community.

7. The Project includes two functionally related alignments or segments, one along Terrace Heights Drive and also a stub proceeding southerly of existing Terrace Park Drive. Both of these proposed road segments will be for public roadway purposes and both are appropriately necessary for the Project to serve its purposes, including the legitimate furtherance of opportunities for improvement and development of the tracts of land south of Terrace Heights Drive in the vicinity of the Project's proposed extension

8

of Terrace Park Drive. The stub proceeding southerly of existing Terrace Park Drive abuts existing right of way of the County immediately to the east for a distance of approximately 200 feet, and also aligns with extensive right of way of the County further south, providing a potential point of connection between Terrace Heights Drive and East Scenic Crest Road at a point near University Parkway.

8. Evidence that the landowner of some of the tracts of land south of Terrace Heights Drive in the vicinity of the Project's proposed extension of Terrace Park Drive has agreed to contribute $250,000 towards the cost of the Project does not alter the appropriateness or legitimacy of the Project as a public use, or the acquisition of the Project's land area as necessary for the public use. The agreement between the landowner and the County in the form of a memorandum of understanding dated October 8, 2018, is a lawful means of the County seeking to cooperate with the landowner towards legitimate public goals of economic development. This is further established because the landowner's funding commitment and the increased development opportunity of the landowner's property achieved with the Project's proposed extension of Terrace Park Drive was instrumental in the County's opportunity and decision to move forward with the road widening and center turn lane on Terrace Heights Drive, with its attendant benefits in traffic efficiency and safety.

9. The fact that the landowner will benefit from the Project by a possible development of the landowner's property does not alter the appropriateness or legitimacy of the Project as a public use, or the acquisition of the Project's land area as necessary for the public use. To the contrary, this is illustrative of the general economic development benefits of public road improvements.

. . . .

12. Nothing in the County's consideration of the public benefits of the Project, including the Project's proposed extension of Terrace Park Drive, demonstrates pretext or bad faith in the consideration, development, and implementation of the Project or of this eminent domain action.

13. There is no evidence that the County engaged in actual fraud, constructive fraud, or arbitrary and capricious conduct in adopting Board of Yakima County Commissioners Resolution 009-2022. The Board of County Commissioners acted reasonably in the exercise of its judgment in taking this action.

14. The County's condemnation and improvement of the above-described property is a public use.

15. The County's condemnation and improvement of the above-described property is required by the public interest.

16. The condemnation and improvement of the above-described property is necessary for the use described herein and in the petition of the County.

CP at 81-84.

Based on these findings, the court concluded:

2. The Project is a public use authorized by law.

3. The Board of County Commissioners acted reasonably in the exercise of its judgment in adopting Resolution 009-2022, which action is deemed conclusive on the necessity of the subject property in the absence of actual fraud or such arbitrary and capricious conduct as would amount to constructive fraud. The subject property is accordingly necessary for the Project.

4. The County may properly consider economic development and future growth in the County in its consideration of the legitimate public benefits of the Project.

5. The County is entitled to the issuance of an order determining and confirming public use and necessity for the taking of the subject property.

CP at 84-85. The court therefore ordered that the matter be set for trial to determine the Churches' compensation for their appropriated property.

The Churches timely appeal.[2]

---

[2] Under RAP 2.2(a)(4), a party may appeal an order of public use and necessity in a condemnation proceeding as a matter of right.

ANALYSIS

The Churches contend: (1) their property is being taken for private use in violation of article I, section 16 of the Washington State Constitution, (2) the trial court's finding of public use and necessity was in error, and (3) the County illegally gifted public funds for the benefit of Falcon Ridge. We disagree with each argument.

Washington's constitution states that "[n]o private property shall be taken or damaged for public or private use without just compensation having first been made." WASH. CONST. art. I, § 16. "The power of eminent domain is limited by both the Washington State Constitution and by statute." *City of Sammamish v. Titcomb*, 25 Wn. App. 2d 820, 835, 525 P.3d 973 (2023). Pursuant to RCW 8.04.070, a condemnation must be necessary for "the public use." *Id.*

"For a proposed condemnation to be lawful, the condemning authority must prove that (1) the use is really public, (2) the public interest requires it, and (3) the property appropriated is necessary for that purpose." *HTK Mgmt., LLC v. Seattle Popular Monorail Auth.*, 155 Wn.2d 612, 629, 121 P.3d 1166 (2005). "The latter two findings are generally subsumed under the definition of 'necessity.'" *City of Sammamish*, 25 Wn. App. 2d at 835 (quoting *Petition of City of Seattle*, 104 Wn.2d 621, 623, 707 P.2d 1348 (1985)).

The Churches argue that the project is not a public use, is not a public necessity, and is an illegal gift of public funds for a private use. The Churches primarily oppose the corner of their property being condemned for a traffic signal.

In a footnote in their brief, the Churches challenge the trial court's "[f]indings [of fact] 3, 4, 6, 7, 8, 9, 12, 13, 14, 15 and 16," and "[c]onclusions [of] law 1-5." Br. of Appellant at 34 n.9. In the footnote, the Churches claim the "findings are not supported by substantial evidence." Br. of Appellant at 34 n.9. The Churches' brief lacks a separate assignment of error section and fails to explain why the findings are unsupported by the evidence. *See* RAP 10.3(a)(4). Instead, the Churches generally argue that the use is not public because Falcon Ridge benefits from the Project, and their appropriated property is not necessary for any public use.

PUBLIC USE

The Churches contend that the Project is an inseparable, and therefore impermissible, mix of private and public use. They argue that the traffic light is only necessary for Falcon Ridge's adjacent development. We disagree.

A determination that a condemnation is for a "public use" is not the same as determining it is a "public necessity" but the two terms do overlap. *HTK Mgmt.*, 155 Wn.2d at 629. Whether a contemplated use is truly "public" is a judicial question. *Id.* (citing WASH. CONST. art. I, § 16). The legislature's declaration that a particular use is a "public use" is not dispositive but is afforded great weight. *Id.* "A trial court's decision

12

on public use will be reversed if the finding is not supported by substantial evidence." *City of Blaine v. Feldstein*, 129 Wn. App. 73, 79, 117 P.3d 1169 (2005). Here, in resolution 009-2022, the Board declared, "This is a project identified to have public use" and "the construction of the project is a public use." Ex. PE-1 at 7, 10. The court found that "[t]he real property and property interests that the County seeks are required for the improvement, reconstruction, maintenance, and operation of a public county road." CP at 81 (finding of fact 2). The court further found that, "[t]he use of the Project roads, including the Project's proposed extension of Terrace Park Drive, will be public." CP at 83 (finding of fact 11). The Churches do not challenge these findings. Br. of Appellant at 34 n.9. Unchallenged findings are verities on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Notwithstanding the Churches' lack of proper assignments of error, the court's unchallenged finding that the Project's proposed extension "will be public" is enough to support its conclusion that "[t]he Project is a public use authorized by law." CP at 83 (finding of fact 11), 8 (conclusion of law 2).

"There is in law a strong presumption that a public highway, available for the use of all who come upon it, is, by its very nature, a public use of land." *State v. Belmont Imp., Co.*, 80 Wn.2d 438, 443, 495 P.2d 635 (1972). Further, our Supreme Court has held that "a finding of public use is not defeated where alleged private use is incidental to public use." *Pub. Util. Dist. No. 2 of Grant County v. N. Am. Foreign Trade Zone Indus.*,

13

*LLC*, 159 Wn.2d 555, 573, 151 P.3d 176 (2007) (NAFTZI).  In *Belmont Imp.*, the

Supreme Court held that a short dead-end road was for public use, even though only one

home was at the end of it.  80 Wn.2d at 443-44.  The court reasoned, "[n]o part of the

condemned and acquired property nor any part of [the] Road will become a private

roadway or driveway."  *Id.* at 443.

Similarly, here, there is no dispute that Terrace Heights Drive and Terrace Park

Drive are public roadways that are open to the general public (finding of fact 11).  Even if

Falcon Ridge benefits from the road expansion and signalization, "[i]f a road or highway

under public ownership or control is a part of a street or highway complex and reasonably

necessary for the control or movement of traffic, the fact that some of the public will use

it more than others does not deprive it of its public character."  *Belmont Imp.*, 80 Wn.2d

at 443.

The Project seeks to expand Terrace Heights Drive to include a center turn lane

and to signalize the intersection with Terrace Park Drive.  This may facilitate or make

development of the area more feasible and convenient for Falcon Ridge, but the signal

will be used by the public as will the roadways and new center turn lane.  The trial court

did not err in finding the Project constitutes a public use.

NECESSITY

The Churches argue that their appropriated property is not necessary for public use. We disagree.

"A condemnation of private property is necessary if it is 'reasonably necessary' under the circumstances." *NAFTZI*, 159 Wn.2d at 576 (quoting *HTK Mgmt.*, 155 Wn.2d at 639 n.19). A "declaration of necessity by a proper legislative body is 'conclusive in the absence of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud.'" *Id* at 575-76 (quoting *HTK Mgmt.*, 155 Wn.2d at 629)*.* "Action, when exercised honestly, fairly, and upon due consideration is not arbitrary and capricious, even though there be room for a difference of opinion upon the course to follow, or a belief by the reviewing authority that an erroneous conclusion has been reached." *City of Tacoma v. Welcker*, 65 Wn.2d 677, 684-85, 399 P.2d 330 (1965). A court's decision on necessity is also reviewed for substantial evidence. *NAFTZI*, 159 Wn.2d at 576.

Here, in resolution 009-2022, the Board declared the Project "is in the best interests of the citizens of Yakima County as determined by the [Board] and Yakima County Engineer as part of a Yakima County approved Six-Year [transportation improvement plan]," and the Churches' property is "*necessary* for construction of the project." Ex. PE-1 at 7, 10 (emphasis added). This declaration is conclusive in the absence of evidence of constructive fraud.

15

Moreover, both the THNP and THCS, in addition to Mr. Pietrusiewicz's testimony, support the trial court's findings that the Project: is based on considerations that will serve the Terrace Heights community (finding of fact 3), will increase safety on Terrace Heights Drive (finding of fact 4), will improve traffic flow (finding of fact 5), "is required by the public interest" (finding of fact 15) and "appropriately necessary" (finding of fact 7), and that the resolution 009-2022 was not based on bad faith, fraud, or arbitrary or capricious conduct (findings of fact 12, 13). CP at 82, 84. The court's conclusion that the Board's resolution is "conclusive" is therefore supported by these findings. CP at 93(conclusion of law 3).

Supporting these findings are the THNP and THCS which reflect the County's capacity and safety concerns relating to Terrace Heights Drive dating back decades. Additionally, Mr. Pietrusiewicz testified that the addition of a center turn lane "improves capacity for the road and it reduces points of conflict for the motoring traffic." RP at 18. In regard to the signalized intersection, Mr. Pietrusiewicz testified that putting the traffic signal at a different location would not work as well because it would be too close to an existing traffic signal, and they are "better spaced out." RP at 49. He also testified:

> Q. You can't have an access to Terrace Park closer to the intersection because of your road design standards?
>
> A. Right.
>
> Q. *So the area that you're taking in this condemnation is the area necessary to provide appropriate separation from the intersection and access to the commercial property?*

16

A. *Correct.*

RP at 54 (emphasis added).

The court next found that "[n]othing in the County's consideration of the public benefits of the Project, including the Project's proposed extension of Terrace Park Drive, demonstrates pretext or bad faith in the consideration, development, and implementation of the Project or of this eminent domain action." CP at 93 (finding of fact 12). The court also found that "[t]he condemnation and improvement of the above-described property is necessary for the use described herein and in the petition of the County." CP at 84 (finding of fact 16). The court therefore concluded that the Board "acted reasonably in the exercise of its judgment in adopting Resolution 009-2022" and the Churches' property is "accordingly necessary for the Project." CP at 93 (conclusion of law 3). The court also concluded that the Board's resolution is "deemed conclusive." CP at 93 (conclusion of law 3). Given the evidence in the record, the court's findings are supported by substantial evidence and the findings support the court's conclusion of public necessity.

In support of their argument, the Churches point to Mr. Pietrusiewicz's testimony that the signal is necessary because of the Falcon Ridge development:

> Q. And then it indicates in addition, a signalized intersection will be built at this intersection of Terrace Park Drive. And we talked about that earlier. You have indicated that the signal which was required solely for the purpose of addressing traffic generated from the commercial development, correct?

17

A. Yes.

Q. The widening project in dealing with the pinch point could be accomplished without a signal?

A. Yes.

RP at 59. But this testimony does little to disprove that the signal is reasonably necessary under the circumstances. The Falcon Ridge development will generate more traffic at the intersection. The addition of a traffic signal will give the public a safer, more convenient way to access the commercial development.

The Churches have not produced evidence of actual fraud or arbitrary and capricious conduct by the Board. Thus, the Board's declaration of necessity is conclusive on the issue.

ILLEGAL GIFT OF PUBLIC FUNDS[3]

Lastly, the Churches argue that the County illegally gifted public funds for the benefit of Falcon Ridge in violation of article VIII, sections 5 and 7 of the Washington State Constitution. We disagree.

---

[3] The County stipulates this argument is raised for the first time on appeal and should not be addressed. RAP 2.5. The Churches respond that RAP 2.5(a)(3) allows a party to raise a "manifest error affecting a constitutional right" for the first time on appeal, and this issue is patently constitutional. Because this is clearly a constitutional issue, we address the merits.

Washington constitution article VIII, § 5 states: "The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation." Washington constitution article VIII, § 7 states:

> No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the core and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

"[P]ublic funds cannot be used to benefit private interests when the public interest is not primarily being served." *CLEAN v. State*, 130 Wn.2d 782, 792, 928 P.2d 1054 (1996). Thus, public expenditures must be used for public purposes. *Id.* at 792-93. However, "the fact that a third party benefits is not sufficient to convert a lawful contract into a gift of public funds." *Peterson v. State*, 195 Wn.2d 513, 523, 460 P.3d 1080 (2020). "Where it is debatable as to whether or not an expenditure is for a public purpose, we will defer to the judgment of the legislature." *CLEAN*, 130 Wn.2d at 793 (citing *Anderson v. O'Brien*, 84 Wn.2d 64, 70, 524 P.2d 390 (1974)).

> In determining whether a challenged transaction is, in fact, a gift of public funds,

> [f]irst, the court asks if the funds are being expended to carry out a fundamental purpose of the government? If the answer to that question is yes, then no gift of public funds has been made. The second prong comes into play only when the expenditures are held to not serve fundamental purposes of government. The court then focuses on the consideration received by the public for the expenditure of public funds and the donative intent of the appropriating body in order to determine whether or not a gift has occurred.

*CLEAN*, 130 Wn.2d at 797-98.

The Churches argue that the center turn lane, the traffic signal, and the access road are for the sole benefit of Falcon Ridge and that Falcon Ridge's reimbursement only covers a small portion of the total Project cost. Thus, they argue the County's use of public funds to cover the rest of cost of the Project is violative of the Washington Constitution.

Pursuant to RCW 36.85.010, the County has the authority to condemn land for roads. Here, the public funds are being used to improve and construct public roads. Maintaining, improving, and constructing public roads has long been held to be a legitimate public use. *Belmont Imp.*, 80 Wn.2d at 443; *see City of Bellevue v. Pine Forest Props., Inc.*, 185 Wn. App. 244, 260, 340 P.3d 938 (2014); *HTK Mgmt.*, 155 Wn.2d at 630. Because, we answer the first question, whether the funds are being expended to carry out a fundamental government purpose, in the affirmative, our inquiry ends.

The Project is not for the sole benefit of Falcon Ridge and therefore does not constitute an illegal gift of public funds.

Affirmed.

No. 39613-4-III
*Yakima County v. Church, et al.*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Cooney, J.


I CONCUR:

_____
Staab, A.C.J.

No. 39613-4-III

FEARING, J. (concurring) —

> *That a taking of property for a highway is a taking for public use has been universally recognized, from time immemorial.* Rindge Co. v. Los Angeles County, *262 U.S. 700, 706, 43 S. Ct. 689, 67 L. Ed. 1186 (1923).*

I concur in the entirety of the majority's ruling and its written opinion. I write separately to accentuate the public nature of a road constructed by a government entity, to address detailed arguments forwarded by David and Penny Church's astute counsel, and to analyze the principal decisions on which the Churches rely.

David and Penny Church contend that Yakima County's proposed intersection on Terrace Heights Drive does not constitute a public use. The Churches also argue that the public lacks any need for the intersection and its signalization. Therefore, the Churches challenge the condemnation of their land adjacent to the proposed intersection and stub road. Falcon Ridge Investments intends to construct a grocery store across the street from the Churches' land. The Churches insist that the county engineer admitted that the intersection, new access road, and signalization would only benefit Falcon Ridge Investments. The Churches add that, even without the engineer's concession, the facts confirm that the condemnation only benefits Falcon Ridge Investments.

Article I, section 16, of the Washington Constitution reads:

Private property shall not be taken for private use. . . . Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: Provided, [t]hat the taking of private property by the state for land reclamation and settlement purposes is hereby declared to be for public use.

RCW 8.08.010 declares:

Every county is hereby authorized and empowered to condemn land and property within the county for public use.

As part of a condemnation action, the court must adjudicate public use and necessity. Toward that end, a court must make three separate, but interrelated, findings: (1) the use in question is really a public use, (2) public interests require it, and, (3) the property to be acquired is necessary to facilitate the public use. *State ex rel. Washington State Convention & Trade Center v. Evans*, 136 Wn.2d 811, 817, 966 P.2d 1252 (1998). A determination of public use does not precisely equate to a finding of public necessity. *City of Des Moines v. Hemenway*, 73 Wn.2d 130, 138, 437 P.2d 171 (1968). Nevertheless, the two concepts overlap and cannot be separated with scalpellic precision. *King County v. Theilman*, 59 Wn.2d 586, 369 P.2d 503 (1962). One could shorten the elements by requiring that the condemnor simply show a public necessity since the phrase assumes use by the public and a need. The Churches conflate the public use

2

element and the necessity element by contending that only Falcon Ridge Investments needs the Terrace Heights Drive intersection improvements.

Under the Washington Supreme Court's interpretation of CONST. art. I, sec. 16, the issue of whether a proposed acquisition be really for a public use is solely a judicial question, although a legislative declaration thereof will be accorded great weight. *City of Tacoma v. Welcker*, 65 Wn.2d 677, 684, 399 P.2d 330 (1965). Conversely, whether the acquisition is necessary to carry out the proposed public use presents a legislative question, and a declaration of necessity by the appropriate legislative body will be deemed conclusive, in the absence of proof of actual fraud or such arbitrary and capricious conduct as would amount to constructive fraud. *City of Tacoma v. Welcker*, 65 Wn.2d 677, 684 (1965). "Necessary" in the context of condemnation does not mean absolute necessity. *State ex rel. Lange v. Superior Court*, 61 Wn.2d 153, 156, 377 P.2d 425 (1963). The word "necessary" means reasonable necessity under the circumstances. *State ex rel. Lange v. Superior Court*, 61 Wn.2d 153, 156 (1963). It does not mean immediate, absolute, or indispensable need, but rather considers the right of the public to expect or demand that certain services be provided. *City of Tacoma v. Welcker*, 65 Wn.2d 677, 684 (1965).

Under Washington law, municipalities undoubtedly possess statutory authority to condemn property for roadways. *Cowlitz County v. Martin*, 142 Wn. App. 860, 867, 177 P.3d 102 (2008). In turn, the law underwrites a strong presumption that a public

3

highway, available for the use of all who come upon it, qualifies, by its very nature, as a public use of land. *State v. Belmont Improvement Co.*, 80 Wn.2d 438, 443, 495 P.2d 635, 638 (1972). Also, the use of the road primarily by one landowner does not alter its public character, for the public character of a road does not depend necessarily upon the degree to which the general public uses it or the amount of traffic that the general public will probably put upon it. *State v. Belmont Improvement Co.*, 80 Wn.2d 438, 443 (1972). If a road or highway under public ownership or control is a part of a street or highway complex and reasonably necessary for the control or movement of traffic, the fact that some of the public will use it more than others does not deprive it of its public character. *State v. Belmont Improvement Co.*, 80 Wn.2d 438, 443 (1972).

The Washington Supreme Court observed:

> Any public way naturally confers a special benefit on those persons whose property adjoins it. All roads terminate somewhere. Dead end streets or highways inevitably and particularly subserve the private interests of the last property owner on the line. Yet the public has an interest in reaching other members thereof.

*State v. Belmont Improvement Co.*, 80 Wn.2d 438, 444 (1972).

Principles derived from foreign decisions echo Washington law. A road qualifies as a public use even if the use is limited to the citizens of a local neighborhood or that the number of citizens likely to avail themselves of it is inconsiderable, so long as the street remains open to all who choose to avail themselves of it. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 187 (Tex. 2019). The mere fact that a particular individual,

4

group, or enterprise may benefit will not deprive the use of its public character. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 187 (Tex. 2019). When a public authority establishes a road, pays for the damages for the condemnation of the land for the road, and public officers maintain control and management of the road, the road constitutes a public highway and may constitutionally be condemned, though it may have been opened on the application of a single person to whose house the road leads and although it may not have been expected when the road was established that it would be used to any considerable extent by any person, except the party for whose accommodation it was opened. *City of Novi v. Robert Adell Children's Funded Trust*, 473 Mich. 242, 251, 701 N.W.2d 144 (2005). The right of travel by all the world, and not the exercise of the right, constitutes a way a public highway. *City of Novi v. Robert Adell Children's Funded Trust*, 473 Mich. 242, 251 (2005).

Once the court adjudges the condemned land to be public, the kind and type of roadway, the route to be followed, and the design and engineering details become the subject of administrative decision. *Deaconess Hospital v. Washington State Highway Commission*, 66 Wn.2d 378, 405, 403 P.2d 54 (1965). Courts lack training and resources to pick the better route for a street, much less design and engineer the project. *Deaconess Hospital v. Washington State Highway Commission*, 66 Wn.2d 378, 405 (1965).

When arguing the lack of public use and necessity for the Terrace Heights Drive intersection, David and Penny Church predominately rely on *State ex rel. Washington*

*State Convention & Trade Center v. Evans*, 136 Wn.2d 811 (1998); *In the Matter of Petition of Seattle*, 96 Wn.2d 616, 627, 638 P.2d 549 (1981); *King County v. Theilman*, 59 Wn.2d 586 (1962); *State ex rel. Puget Sound Power and Light Co. v. Superior Court*, 133 Wash. 308, 233 P. 651 (1925); and *State v. Bank of California*, 5 Wn. App. 861, 491 P.2d 697 (1971). Each case owns distinguishing features from Yakima County's condemnation of the Churches' land.

*State ex rel. Washington State Convention & Trade Center v. Evans*, 136 Wn.2d 811 (1998) helps Yakima County not David and Penny Church. Property owners brought action challenging the state's proposed condemnation of property for the purpose of expanding the state convention center. The Supreme Court held that the State could use the power of eminent domain for the proposed acquisition, despite anticipated partial private use of property since the State sought to condemn no more property than would be necessary to accomplish the purely public component of the project.

David and Penny Church emphasize the rule that, if a private use joins with a public use in such a way that the two cannot be separated, the condemning authority cannot invoke the right of eminent domain. According to the Churches, the mixing of public and private uses corrupts condemnation authority. From *In the Matter of Petition of Seattle*, 96 Wn.2d 616, 627 (1981), the first of two decisions addressing Seattle's Westlake Mall, the Churches extract the rule that an unconstitutional taking occurs when the city combines a private use with a public use in such a way that the two cannot be

6

separated. The Churches contend that the Terrace Heights Drive project combines public and private uses.

The Supreme Court visited two stratagems by which the City of Seattle sought to condemn property for Westlake Mall. *In the Matter of Petition of City of Seattle*, 96 Wn.2d 616 (1981) and *In the Matter of Petition of City of Seattle*, 104 Wn.2d 621, 707 P.2d 1348 (1985). As originally conceived and reviewed in the former case, Seattle proposed a public park, other open spaces, a parking garage, a new monorail terminal, an art museum, and 186,000 square feet of retail and cinema space which the city would lease to private parties. The Supreme Court then held that the proposed project was for both public and private purposes and the City could not use its condemnation power to acquire the needed property.

The first Westlake Mall project proposal included employing the power of condemnation for private retail purposes. The mixed public and private use did not attend to the same land, but rather a split of the land into one private use parcel and another public use parcel. The road Yakima County seeks to build does not include the lease or transfer of land to Falcon Ridge Investments for retail purposes. Yakima County will retain all of the project as a county street.

Following the Washington Supreme Court's decision in *In the Matter of Petition of City of Seattle*, 96 Wn.2d 616 (1981), Seattle devised a new method of achieving its goals, which method the Supreme Court reviewed in *In the Matter of Petition of City of*

*Seattle*, 104 Wn.2d 621 (1985). The city had already acquired some of the property north of Pine Street, on which would be built the proposed museum and retail establishments. The City sold this property to a developer on the condition that the developer follow the City's architectural plans. Seattle then wanted to condemn property solely for a park that, when completed, would present a single architectural and aesthetic plan with the private development. Seattle would retain ownership of the park. In the 1985 Westlake Mall decision, the Supreme Court adjudged the second arrangement to comply with the public use and necessity requirement of the Washington State constitution. The park's consistency with the retail theme did not invalidate the condemnation.

In *King County v. Theilman*, 59 Wn.2d 586 (1962), the Supreme Court reviewed the superior court's order adjudicating public use. Jack Theilman owned a 13-acre tract of land with 455 feet of frontage on the south side of the Issaquah-Newport Road. On the east, his property adjoined a 36-acre tract owned by Highland Development Company. The 36-acre tract lacked frontage on the Issaquah-Newport Road. Nevertheless, Highland Development Company owned lots 8 and 9 of the Martindale Addition contiguous to the northern boundary of the Highland Development Company's land at its northwest corner. Thus, Highland Development Company had approximately 400 feet of frontage on the highway. Originally, Highland Development Company filed a comprehensive plan that proposed a plat of its entire 36-acre tract, plus lots 8 and 9 of the Martindale Addition. The plat afforded access to the Issaquah-Newport Road to the 32-

acre land through lots 8 and 9. The county engineer and the King County Planning Commission approved the plat. Later Highland Development Company changed plans because it wished to develop Lots 8 and 9. The company contacted Theilman to purchase access across his acreage. Theilman declined. The county, at the request of Highland Development Company, agreed to condemn Thielman's land to provide access, with Thielman agreeing to pay for the cost of the condemnation and the road construction. Nevertheless, access across Highland Development's land was just as satisfactory to provide access to the property.

The Washington Supreme Court, in In *King County v. Theilman*, reversed the order of public use and necessity. The court characterized the case as "bizarre" and "unique." 59 Wn.2d 586, 595 (1962). The condemnation allowed the developer to do indirectly what it could not do directly. The court emphasized that the county lacked funds to build the road and simply performed the bidding of the developer.

Yakima County and Falcon Ridge Investments engaged in no similar scheme to condemn David and Penny Church's land. Yakima County had long planned to build a new street adjacent to the Churches' land and to signalize the intersection. Yakima County plans to pay ninety percent of the cost of the project. The county will receive state Supporting Investment in Economic Development funds made to finance public infrastructure such as access roads. The Churches present no evidence that access is not needed across a portion of their property.

9

Yakima County for decades noted the traffic congestion on Terrace Heights Drive and the need for additional traffic capacity. The county also noticed the need for additional traffic capacity for public safety, security, and emergency response services. County engineer Matthew Pietrusiewicz testified that the county intended to take no more land than necessary for the project. The project needs a traffic signal because of traffic generated by the Falcon Ridge Investments development. David and Penny Church emphasize testimony from the county that travel to Falcon Ridge Investments property would be unsafe without the condemnation. This argument benefits Yakima County.

The century-old *State ex rel. v. Superior Court for Snohomish County*, 133 Wash. 308, 308–09, 233 P. 651 (1925) demands astute reading because of the denseness of the opinion. Puget Sound Power & Light Company wished to construct a hydro-electric plant on Baker River, to produce additional electric power. In order to transmit this power, the company needed to construct and use a transmission line across the land of Floyd Sill. After being unable to agree with Sill on the price to be paid for an easement for the transmission line, Puget Sound Power & Light sought to acquire the land by condemnation. Nevertheless, the power company already generated a surplus over all demand. The superior court ruled that the intended use was not a public use, while emphasizing the lack of need for the building of the plant. The Supreme Court affirmed. The Supreme Court relied on the mixed and inseparable private and public use rule later mentioned in *In the Matter of Petition of Seattle*, 96 Wn.2d 616, 627 (1981). The court

10

adjudged the power company to engage in both public and private enterprises, although the court did not identify what constituted private or public use of the company's facilities.

In *State v. Bank of California*, 5 Wn. App. 861 (1971), a Court of Appeals decision, the State Highway Department sought to condemn eleven acres of the bank's 18-acre tract for the purpose of constructing an interchange on a state highway near pictographic Gig Harbor. The superior court adjudicated a public use and necessity to all but a 50 by 1350-foot strip of land inside the acreage containing trees. The State intended part of the 11-acre taking to be used to reroute an existing 100-footwide Tacoma City Light right-of-way around the interchange. The highway department's original plan ran a power line along the eastern boundary of the bank's tract, which bordered the Rushmore residential area. Pursuant to demands from Rushmore residents at the access hearing, the highway department reviewed its plans and concluded that the power line could be moved 50 feet closer to the interchange and a 50 by 1350-foot strip of trees presently on the land could remain between Rushmore and the power lines and interchange. The superior court ruled that any taking of the strip would pose an unconstitutional condemnation for a private purpose as the highway department's change in plans demonstrated that interchange development did not need the strip. Thus, the State Highway Department sought to condemn the act as a screen for the Rushmore residents, a private interest.

This court affirmed the superior court in *State v. Bank of California*. The court

reasoned that the state failed to establish that the 50-foot strip, covered with trees, would

benefit the motoring public on the state highway. A shopping center obstructed the view

of the trees for southbound traffic. The angle that northbound motorists would travel

permitted only a brief glimpse of the trees. A park in existence adjacent to 375 feet of the

disputed strip already afforded natural beauty. The evidence established that the highway

department intended the strip solely for the purpose of screening four or five private

property owners from the highway and power line. This court emphasized that its unique

facts entailed a large section of the proposed green belt of trees separated from the

highway by the shopping center. The court characterized the proposed green belt as an

afterthought.

The government in *State v. Bank of California* did not intend to use the disputed

strip as a road, but rather as a scenic and noise barrier for no more than five property

owners. No one challenged the taking of the portion of the project devoted to the

roadway. Nevertheless, I question whether the Washington Supreme Court would deem

this court's decision in *State v. Bank of California* to be good law since aesthetic barriers

typically accompany highways near residential plats.

*State v. Belmont Improvement Co.*, 80 Wn.2d 438 (1972) supports Yakima

County's position. Joseph and Margie Malinowski appealed an order of public use and

necessity in eminent domain authorizing the state to take a strip of their property and

utilize it for a public road so as to provide access to other property rendered virtually landlocked by a limited access highway project. The state was constructing the highway near the Malinowskis' property. The highway would bring to a dead end Kulshan Road upon which the Malinowskis' property fronted. A parcel owned by the Nevills once fronted would become landlocked. As part of the highway project, the State sought to condemn a section from the Malinowski property that would allow the Nevills' land access to a nearby street. The street would be open at all times to public use. The Supreme Court affirmed the declaration of public use and necessity, despite only one property owner being benefitted by the condemnation, because the condemned land would become a part of a public street network.

Three recent foreign decisions confirm the legitimacy of the taking by Yakima County. In *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175 (Tex. 2019), the city of Rowlett exercised its eminent domain authority to take KMS' private road easement and convert it to a public road connecting several commercial retail and restaurant sites. KMS emphasized that the city entered an economic incentives deal with a developer that would secure a grocery store for the city. KMS argued that the taking did not qualify as a public use because of the city's relationship with the developer particularly since the grocery store would principally benefit from the public road. KMS insisted that the taking constituted a pretext to confer a private benefit on a private party. Much of the Texas Supreme Court's opinion addressed a state statute that prohibited

13

takings for economic development purposes. The state Supreme Court found the statute inapplicable because of a statutory exception for roadways. More importantly, the court affirmed two lower courts' affirmation of a public necessity.

The case of *City of Novi v. Robert Adell Children's Funded Trust*, 473 Mich. 242 (2005), posed the question of whether the city of Novi fulfilled the requirement of a public use when the city attempted to take private property to construct a road available for use by the public but primarily used by a private entity that contributed funds to the project. The Michigan court answered that such a road qualified as a public use. The appeal also raised the issue of whether the city abused its discretion in determining a public necessity for the condemnation when the city never considered alternatives to the taking. The court concluded that a failure of the city to consider alternatives was not an abuse of its discretion.

The city of Novi fretted about traffic congestion that caused a growing traffic hazard at the intersection of Grand River Avenue and Novi Road inside the city. A study recommended a ring road around the intersection to relieve traffic congestion and provide access to vacant land not fronting on Grand River Avenue or Novi Road. The study also recommended a spur road, from the northwest side of the ring road, that would access industrial establishments that then gained access from Grand River Avenue. Wisne Corporation was one of the industrial entities that would be served by the spur road. The new spur road was to traverse property owned by the trust even though Wisne owned

14

property that could be used for a new access road. Wisne agreed to pay $200,000 toward the funding of the spur road. The trust challenged the condemnation because the road would primarily serve private entities and the city approved of the condemnation because the funding Wisne agreed to provide would entitle the city to obtain state funding for the rest of the ring road project. The Supreme Court of Michigan observed that the city would retain ownership of the condemned land.

In *Rodgers Development Co. v. Town of Tilton*, 147 N.H. 57, 781 A.2d 1029 (2001), Rodgers Development and Market Basket, Inc. owned abutting property in the commercial district of the Town of Tilton. In conjunction with its plans to open a large supermarket on its property, Market Basket petitioned the selectmen for the construction of two roads on existing rights-of-way over land owned by Rodgers. The proposed layout included widening both roads. Market Basket assumed the costs of road construction and associated damages and improvements. The New Hampshire Supreme Court denied Rodgers' challenge to the condemnation. The court declared that a road, despite particularly benefitting one party, constituted a public use.

I concur.

_Fearing, J._____
Fearing, J.

15